[L.A. No. 29705. In Bank. Sept. 30, 1970.]

SHIRLEY MacLAINE PARKER, Plaintiff and Respondent, v. TWENTIETH CENTURY-FOX FILM CORPORATION, Defendant and Appellant.

**COUNSEL**

Musick, Peeler & Garrett and Bruce A. Bevan, Jr., for Defendant and Appellant.

Benjamin Neuman for Plaintiff and Respondent.

**OPINION**

BURKE, J.—Defendant Twentieth Century-Fox Film Corporation appeals from a summary judgment granting to plaintiff the recovery of agreed compensation under a written contract for her services as an actress in a motion picture. As will appear, we have concluded that the trial court correctly ruled in plaintiff's favor and that the judgment should be affirmed.

Plaintiff is well known as an actress, and in the contract between plaintiff and defendant is sometimes referred to as the "Artist." Under the contract, dated August 6, 1965, plaintiff was to play the female lead in defendant's contemplated production of a motion picture entitled "Bloomer Girl." The contract provided that defendant would pay plaintiff a minimum "guaranteed compensation" of $53,571.42 per week for 14 weeks commencing May 23, 1966, for a total of $750,000. Prior to May 1966 defendant decided not to produce the picture and by a letter dated April 4, 1966, it notified plaintiff of that decision and that it would not "comply with our obligations to you under" the written contract.

By the same letter and with the professed purpose "to avoid any damage to you," defendant instead offered to employ plaintiff as the leading actress in another film tentatively entitled "Big Country, Big Man" (hereinafter, "Big Country"). The compensation offered was identical, as were 31 of

the 34 numbered provisions or articles of the original contract.[1] Unlike "Bloomer Girl," however, which was to have been a musical production, "Big Country" was a dramatic "western type" movie. "Bloomer Girl" was to have been filmed in California; "Big Country" was to be produced in Australia. Also, certain terms in the proffered contract varied from those of the original.[2] Plaintiff was given one week within which to accept; she did not and the offer lapsed. Plaintiff then commenced this action seeking recovery of the agreed guaranteed compensation.

The complaint sets forth two causes of action. The first is for money due under the contract; the second, based upon the same allegations as the first, is for damages resulting from defendant's breach of contract. Defendant in its answer admits the existence and validity of the contract, that plaintiff complied with all the conditions, covenants and promises and stood ready to complete the performance, and that defendant breached and "anticipatorily repudiated" the contract. It denies, however, that any money is due to plaintiff either under the contract or as a result of its breach, and pleads as an affirmative defense to both causes of action plaintiff's

[1]Among the identical provisions was the following found in the last paragraph of Article 2 of the original contract: "We [defendant] shall not be obligated to utilize your [plaintiff's] services in or in connection with the Photoplay hereunder, our sole obligation, subject to the terms and conditions of this Agreement, being to pay you the guaranteed compensation herein provided for."

[2]Article 29 of the original contract specified that plaintiff approved the director already chosen for "Bloomer Girl" and that in case he failed to act as director plaintiff was to have approval rights of any substitute director. Article 31 provided that plaintiff was to have the right of approval of the "Bloomer Girl" dance director, and Article 32 gave her the right of approval of the screenplay.

Defendant's letter of April 4 to plaintiff, which contained both defendant's notice of breach of the "Bloomer Girl" contract and offer of the lead in "Big Country," eliminated or impaired each of those rights. It read in part as follows: "The terms and conditions of our offer of employment are identical to those set forth in the 'BLOOMER GIRL' Agreement, Articles 1 through 34 and Exhibit A to the Agreement, except as follows:

"1. Article 31 of said Agreement will not be included in any contract of employment regarding 'BIG COUNTRY, BIG MAN' as it is not a musical and it thus will not need a dance director.

"2. In the 'BLOOMER GIRL' agreement, in Articles 29 and 32, you were given certain director and screenplay approvals and you had preapproved certain matters. Since there simply is insufficient time to negotiate with you regarding your choice of director and regarding the screenplay and since you already expressed an interest in performing the role in 'BIG COUNTRY, BIG MAN,' we must exclude from our offer of employment in 'BIG COUNTRY, BIG MAN' any approval rights as are contained in said Articles 29 and 32; however, we shall consult with you respecting the director to be selected to direct the photoplay and will further consult with you with respect to the screenplay and any revisions or changes therein, provided, however, that if we fail to agree . . . the decision of . . . [defendant] with respect to the selection of a director and to revisions and changes in the said screenplay shall be binding upon the parties to said agreement."

allegedly deliberate failure to mitigate damages, asserting that she unreasonably refused to accept its offer of the leading role in "Big Country."

Plaintiff moved for summary judgment under Code of Civil Procedure section 437c, the motion was granted, and summary judgment for $750,000 plus interest was entered in plaintiff's favor. This appeal by defendant followed.

■ The familiar rules are that the matter to be determined by the trial court on a motion for summary judgment is whether facts have been presented which give rise to a triable factual issue. The court may not pass upon the issue itself. ■ Summary judgment is proper only if the affidavits or declarations[3] in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show facts sufficient to present a triable issue of fact. The affidavits of the moving party are strictly construed, and doubts as to the propriety of summary judgment should be resolved against granting the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts. ■ The moving party cannot depend upon allegations in his own pleadings to cure deficient affidavits, nor can his adversary rely upon his own pleadings in lieu or in support of affidavits in opposition to a motion; however, a party can rely on his adversary's pleadings to establish facts not contained in his own affidavits. (*Slobojan* v. *Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 436-437 [74 Cal.Rptr. 895, 450 P.2d 271]; and cases cited.) ■ Also, the court may consider facts stipulated to by the parties and facts which are properly the subject of judicial notice. (*Ahmanson Bank & Trust Co.* v. *Tepper* (1969) 269 Cal.App.2d 333, 342 [74 Cal.Rptr. 774]; *Martin* v. *General Finance Co.* (1966) 239 Cal. App.2d 438, 442 [48 Cal.Rptr. 773]; *Goldstein* v. *Hoffman* (1963) 213 Cal.App.2d 803, 814 [29 Cal.Rptr. 334]; *Thomson* v. *Honer* (1960) 179 Cal.App.2d 197, 203 [3 Cal.Rptr. 791].)

As stated, defendant's sole defense to this action which resulted from its deliberate breach of contract is that in rejecting defendant's substitute offer of employment plaintiff unreasonably refused to mitigate damages.

■ The general rule is that the measure of recovery by a wrongfully discharged employee is the amount of salary agreed upon for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment. (*W. F. Boardman Co.* v. *Petch* (1921) 186 Cal. 476, 484

---

[3]In this opinion "affidavits" includes "declarations under penalty of perjury." (See Code Civ. Proc., § 2015.5.)

[199 P. 1047]; *De Angeles* v. *Roos Bros., Inc.* (1966) 244 Cal.App.2d 434, 441-442 [52 Cal.Rptr. 783]; *de la Falaise* v. *Gaumont-British Picture Corp.* (1940) 39 Cal.App.2d 461, 469 [103 P.2d 447], and cases cited; see also *Wise* v. *Southern Pac. Co.* (1970) 1 Cal.3d 600, 607-608 [83 Cal. Rptr. 202, 463 P.2d 426].)[4] ■ However, before projected earnings from other employment opportunities not sought or accepted by the discharged employee can be applied in mitigation, the employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages. (*Gonzales* v. *Internat. Assn. of Machinists* (1963) 213 Cal.App.2d 817, 822-824 [29 Cal.Rptr. 190]; *Harris* v. *Nat. Union etc. Cooks, Stewards* (1953) 116 Cal.App.2d 759, 761 [254 P.2d 673]; *Crillo* v. *Curtola* (1949) 91 Cal.App.2d 263, 275 [204 P.2d 941]; *de la Falaise* v. *Gaumont-British Picture Corp., supra,* 39 Cal.App.2d 461, 469; *Schiller* v. *Keuffel & Esser Co.* (1963) 21 Wis.2d 545 [124 N.W.2d 646, 651]; 28 A.L.R. 736, 749; 22 Am.Jur.2d, Damages, §§ 71-72, p. 106.)

In the present case defendant has raised no issue of *reasonableness of efforts* by plaintiffs to obtain other employment; the sole issue is whether plaintiff's refusal of defendant's substitute offer of "Big Country" may be used in mitigation. Nor, if the "Big Country" offer was of employment different or inferior when compared with the original "Bloomer Girl" employment, is there an issue as to whether or not plaintiff acted reasonably in refusing the substitute offer. Despite defendant's arguments to the contrary, no case cited or which our research has discovered holds or suggests that reasonableness is an element of a wrongfully discharged employee's option to reject, or fail to seek, different or inferior employment lest the possible earnings therefrom be charged against him in mitigation of damages.[5]

---

[4]Although it would appear that plaintiff was not *discharged* by defendant in the customary sense of the term, as she was not permitted by defendant to enter upon performance of the "Bloomer Girl" contract, nevertheless the motion for summary judgment was submitted for decision upon a stipulation by the parties that "plaintiff Parker was discharged."

[5]Instead, in each case the reasonableness referred to was that of the *efforts* of the employee to obtain other employment that was not different or inferior; his right to reject the latter was declared as an unqualified rule of law. Thus, *Gonzales* v. *Internat. Assn. of Machinists, supra,* 213 Cal.App.2d 817, 823-824, holds that the trial court correctly instructed the jury that plaintiff union member, a machinist, was required to make "such *efforts* as the average [member of his union] desiring employment would make at that particular time and place" (italics added); but, further, that the court *properly rejected* defendant's *offer of proof of* the *availability of other kinds of employment* at the same or higher pay than plaintiff usually received

■ Applying the foregoing rules to the record in the present case, with all intendments in favor of the party opposing the summary judgment motion—here, defendant—it is clear that the trial court correctly ruled that plaintiff's failure to accept defendant's tendered substitute employment could not be applied in mitigation of damages because the offer of the "Big Country" lead was of employment both different and inferior, and that no factual dispute was presented on that issue. The mere circumstance that "Bloomer Girl" was to be a musical review calling upon plaintiff's talents as a dancer as well as an actress, and was to be produced in the City of Los Angeles, whereas "Big Country" was a straight dramatic role in a "Western Type" story taking place in an opal mine in Australia, demonstrates the difference in kind between the two employments; the female lead as a dramatic actress in a western style motion picture can by no stretch of imagination be considered the equivalent of or substantially similar to the lead in a song-and-dance production.

---

and all outside the jurisdiction of his union, as plaintiff could not be required to accept different employment or a nonunion job.

In *Harris* v. *Nat. Union etc. Cooks, Stewards, supra,* 116 Cal.App.2d 759, 761, the issues were stated to be, inter alia, whether comparable employment was open to each plaintiff employee, and if so whether each plaintiff made a *reasonable effort* to secure such employment. It was held that the trial court *properly sustained an objection to an offer to prove a custom of accepting a job in a lower rank* when work in the higher rank was not available, as "The duty of mitigation of damages . . . does not require the plaintiff 'to seek or to accept other employment of a different or inferior kind.' " (P. 764 [5].)

See also: *Lewis* v. *Protective Security Life Ins. Co.* (1962) 208 Cal.App.2d 582, 584 [25 Cal.Rptr. 213]: *"honest effort* to find similar employment . . . ." (Italics added.)

*de la Falaise* v. *Gaumont-British Picture Corp., supra,* 39 Cal.App.2d 461, 469: "reasonable effort."

*Erler* v. *Five Points Motors, Inc.* (1967) 249 Cal.App.2d 560, 562 [57 Cal.Rptr. 516]: Damages may be mitigated "by a showing that the employee, by the exercise of *reasonable diligence and effort,* could have procured comparable employment . . . ." (Italics added.)

*Savitz* v. *Gallaccio* (1955) 179 Pa.Super. 589 [118 A.2d 282, 286]; *Atholwood Dev. Co.* v. *Houston* (1941) 179 Md. 441 [19 A.2d 706, 708]; *Harcourt & Co.* v. *Heller* (1933) 250 Ky. 321 [62 S.W.2d 1056]; *Alaska Airlines, Inc.* v. *Stephenson* (1954) 217 F.2d 295, 299 [15 Alaska 272]; *United Protective Workers* v. *Ford Motor Co.* (7th Cir. 1955) 223 F.2d 49, 52 [48 A.L.R.2d 1285]; *Chisholm* v. *Preferred Bankers' Life Assur. Co.* (1897) 112 Mich. 50 [70 N.W. 415]; each of which held that the *reasonableness of the* employee's *efforts,* or his excuses for failure, to find other similar employment was properly submitted to the jury as a question of fact. NB: *Chisholm* additionally *approved* a jury *instruction* that a *substitute offer* of the employer to work for a lesser compensation was *not to be considered in mitigation,* as the employee was not required to accept it.

*Williams* v. *National Organization, Masters, etc.* (1956) 384 Pa. 413 [120 A.2d 896, 901 [13]]: "Even assuming that plaintiff . . . could have obtained employment in ports other than . . . where he resided, *legally* he was not compelled to do so in order to mitigate his damages." (Italics added.)

■ Additionally, the substitute "Big Country" offer proposed to eliminate or impair the director and screenplay approvals accorded to plaintiff under the original "Bloomer Girl" contract (see fn. 2, *ante*), and thus constituted an offer of inferior employment. No expertise or judicial notice is required in order to hold that the deprivation or infringement of an employee's rights held under an original employment contract converts the available "other employment" relied upon by the employer to mitigate damages, into inferior employment which the employee need not seek or accept. (See *Gonzales* v. *Internat. Assn. of Machinists, supra,* 213 Cal.App.2d 817, 823-824; and fn. 5, *post.*)

■ Statements found in affidavits submitted by defendant in opposition to plaintiff's summary judgment motion, to the effect that the "Big County" offer was not of employment different from or inferior to that under the "Bloomer Girl" contract, merely repeat the allegations of defendant's answer to the complaint in this action, constitute only conclusionary assertions with respect to undisputed facts, and do not give rise to a triable factual issue so as to defeat the motion for summary judgment. (See *Colvig* v. *KSFO* (1964) 224 Cal.App.2d 357, 364 [36 Cal.Rptr. 701]; *Dashew* v. *Dashew Business Machines, Inc.* (1963) 218 Cal.App.2d 711, 715 [32 Cal.Rptr. 682]; *Hatch* v. *Bush* (1963) 215 Cal.App.2d 692, 707 [30 Cal. Rptr. 397, 13 A.L.R.3d 503]; *Barry* v. *Rodgers* (1956) 141 Cal.App.2d 340, 342 [296 P.2d 898].)

In view of the determination that defendant failed to present any facts showing the existence of a factual issue with respect to its sole defense— plaintiff's rejection of its substitute employment offer in mitigation of damages—we need not consider plaintiff's further contention that for various reasons, including the provisions of the original contract set forth in footnote 1, *ante,* plaintiff was excused from attempting to mitigate damages.

The judgment is affirmed.

McComb, J., Peters, J., Tobriner, J., Kaus, J.,* and Roth, J.,* concurred.

**SULLIVAN, Acting C. J.**—The basic question in this case is whether or not plaintiff acted reasonably in rejecting defendant's offer of alternate employment. The answer depends upon whether that offer (starring in "Big Country, Big Man") was an offer of work that was substantially similar to her former employment (starring in "Bloomer Girl") or of work that was of a different or inferior kind. To my mind this is a factual issue which the trial court should not have determined on a motion for summary judgment.

*Assigned by the Acting Chairman of the Judicial Council.

The majority have not only repeated this error but have compounded it by applying the rules governing mitigation of damages in the employer-employee context in a misleading fashion. Accordingly, I respectfully dissent.

The familiar rule requiring a plaintiff in a tort or contract action to mitigate damages embodies notions of fairness and socially responsible behavior which are fundamental to our jurisprudence. Most broadly stated, it precludes the recovery of damages which, through the exercise of due diligence, could have been avoided. Thus, in essence, it is a rule requiring reasonable conduct in commercial affairs. This general principle governs the obligations of an employee after his employer has wrongfully repudiated or terminated the employment contract. Rather than permitting the employee simply to remain idle during the balance of the contract period, the law requires him to make a reasonable effort to secure other employment.[1] He is not obliged, however, to seek or accept any and all types of work which may be available. Only work which is in the same field and which is of the same quality need be accepted.[2]

Over the years the courts have employed various phrases to define the type of employment which the employee, upon his wrongful discharge, is under an obligation to accept. Thus in California alone it has been held that he must accept employment which is "substantially similar" (*Lewis* v. *Protective Security Life Ins. Co.* (1962) 208 Cal.App.2d 582, 584 [25 Cal.Rptr. 213]; *de la Falaise* v. *Gaumont-British Picture Corp.* (1940) 39 Cal.App.2d 461, 469 [103 P.2d 447]); "comparable employment" (*Erler* v. *Five Points Motors, Inc.* (1967) 249 Cal.App.2d 560, 562 [57 Cal.Rptr. 516]; *Harris* v. *Nat. Union etc. Cooks, Stewards* (1953) 116 Cal.App.2d 759, 761 [254 P.2d 673]); employment "in the same general line of the first employment" (*Rotter* v. *Stationers Corp.* (1960) 186 Cal.App.2d 170, 172 [8 Cal. Rptr. 690]); "equivalent to his prior position" (*De Angeles* v. *Roos Bros., Inc.* (1966) 244 Cal.App.2d 434, 443 [52 Cal.Rptr. 783]); "employment in a similar capacity" (*Silva* v. *McCoy* (1968) 259 Cal.App.2d 256, 260

---

[1]The issue is generally discussed in terms of a duty on the part of the employee to minimize loss. The practice is long-established and there is little reason to change despite Judge Cardozo's observation of its subtle inaccuracy. "The servant is free to accept employment or reject it according to his uncensored pleasure. What is meant by the supposed duty is merely this, that if he unreasonably reject, he will not be heard to say that the loss of wages from then on shall be deemed the jural consequence of the earlier discharge. He has broken the chain of causation, and loss resulting to him thereafter is suffered through his own act." (*McClelland* v. *Climax Hosiery Mills* (1930) 252 N.Y. 347, 359 [169 N.E. 605, 609], concurring opinion.)

[2]This qualification of the rule seems to reflect the simple and humane attitude that it is too severe to demand of a person that he attempt to find and perform work for which he has no training or experience. Many of the older cases hold that one need not accept work in an inferior rank or position nor work which is more menial or arduous. This suggests that the rule may have had its origin in the bourgeois fear of resubmergence in lower economic classes.

[66 Cal.Rptr. 364]); employment which is "not . . . of a different or inferior kind. . . ." (*Gonzales* v. *Internat. Assn. of Machinists* (1963) 213 Cal.App.2d 817, 822 [29 Cal.Rptr. 190].)[3]

For reasons which are unexplained, the majority cite several of these cases yet select from among the various judicial formulations which they contain one particular phrase, "Not of a different or inferior kind," with which to analyze this case. I have discovered no historical or theoretical reason to adopt this phrase, which is simply a negative restatement of the affirmative standards set out in the above cases, as the exclusive standard. Indeed, its emergence is an example of the dubious phenomenon of the law responding not to rational judicial choice or changing social conditions, but to unrecognized changes in the language of opinions or legal treatises.[4] However, the phrase is a serviceable one and my concern is not with its use as the standard but rather with what I consider its distortion.

The relevant language excuses acceptance only of employment which is of a *different kind*. (*Gonzales* v. *Internat. Assn. of Machinists, supra*, 213 Cal.App.2d 817, 822; *Harris* v. *Nat. Union etc. Cooks, Stewards, supra*, 116 Cal.App.2d 759, 761; *de la Falaise* v. *Gaumont-British Picture Corp., supra*, 39 Cal.App.2d 461, 469.) It has never been the law that the mere existence of *differences between two jobs in the same field* is sufficient, as a matter of law, to excuse an employee wrongfully discharged from one from accepting the other in order to mitigate damages. Such an approach would effectively eliminate any obligation of an employee to attempt to

[3]See also 28 A.L.R. 736, 740-742; 15 Am.Jur. 431.

[4]The earliest California case which the majority cite is *de la Falaise* v. *Gaumont-British Picture Corp., supra*, 39 Cal.App.2d at p. 469. *de la Falaise* states "The 'other employment' which the discharged employee is bound to seek is employment of a character substantially similar to that of which he has been deprived; he need not enter upon service of a different or inferior kind, . . ." *de la Falaise* cites, in turn, two sources as authority for this proposition. The first is 18 R.C.L. (Ruling Case Law) 529. That digest, however, states only that the "discharged employee . . . need not enter upon service of a *more menial kind*." (Italics added.) It was in this form that the rule entered California law explicitly, *Gregg* v. *McDonald* (1925) 73 Cal. App. 748, 757 [239 P. 373], quoting the text verbatim. The second citation is to 28 A.L.R. 737. The author of the annotation states: "The principal question with which this annotation is concerned is the kind of employment which the employee is under a duty to seek or accept in order to reduce the damages caused by his wrongful discharge. Must one who is skilled in some special work he is employed to do, as an actor, musician, accountant, etc., seek or accept employment of an *entirely different nature*?" (Italics added.) (28 A.L.R. 736.) In answering that question in the negative, the annotation employs the language adopted by the majority: The employee is "not obliged to seek or accept other employment of a different or inferior kind, . . ." (*Id.* at p. 737.) Rather than a restatement of a generally agreed upon rule, however, the phrase is an epitomization of the varied formulations found in the cases cited. (See 28 A.L.R. 740-742.)

minimize damage arising from a wrongful discharge. The only alternative job offer an employee would be required to accept would be an offer of his former job by his former employer.

Although the majority appear to hold that there was a difference "in kind" between the employment offered plaintiff in "Bloomer Girl" and that offered in "Big Country" (*ante*, at p. 183), an examination of the opinion makes crystal clear that the majority merely point out differences between the two *films* (an obvious circumstance) and then apodically assert that these constitute a difference in the *kind* of *employment*. The entire rationale of the majority boils down to this: that the "*mere circumstances*" that "Bloomer Girl" was to be a musical review while "Big Country" was a straight drama "demonstrates the difference in kind" since a female lead in a western is not "the equivalent of or substantially similar to" a lead in a musical. This is merely attempting to prove the proposition by repeating it. It shows that the vehicles for the display of the star's talents are different but it does not prove that her employment as a star in such vehicles is of necessity different *in kind* and either inferior or superior.

I believe that the approach taken by the majority (a superficial listing of differences with no attempt to assess their significance) may subvert a valuable legal doctrine.[5] The inquiry in cases such as this should not be whether differences between the two jobs exist (there will always be differences) but whether the differences which are present are substantial enough to constitute differences in the *kind* of employment or, alternatively, whether they render the substitute work employment of an *inferior kind*.

It seems to me that *this* inquiry involves, in the instant case at least, factual determinations which are improper on a motion for summary judgment. Resolving whether or not one job is substantially similar to another or whether, on the other hand, it is of a different or inferior kind, will often (as here) require a critical appraisal of the similarities and differences between them in light of the importance of these differences to the employee. This necessitates a weighing of the evidence, and it is precisely this undertaking which is forbidden on summary judgment. (*Garlock* v. *Cole* (1962) 199 Cal.App.2d 11, 14 [18 Cal.Rptr. 393].)

---

[5]The values of the doctrine of mitigation of damages in this context are that it minimizes the unnecessary personal and social (e.g., nonproductive use of labor, litigation) costs of contractual failure. If a wrongfully discharged employee can, through his own action and without suffering financial or psychological loss in the process, reduce the damages accruing from the breach of contract, the most sensible policy is to require him to do so. I fear the majority opinion will encourage precisely opposite conduct.

This is not to say that summary judgment would never be available in an action by an employee in which the employer raises the defense of failure to mitigate damages. No case has come to my attention, however, in which summary judgment has been granted on the issue of whether an employee was obliged to accept available alternate employment. Nevertheless, there may well be cases in which the substitute employment is so manifestly of a dissimilar or inferior sort, the declarations of the plaintiff so complete and those of the defendant so conclusionary and inadequate that no factual issues exist for which a trial is required. This, however, is not such a case.

It is not intuitively obvious, to me at least, that the leading female role in a dramatic motion picture is a radically different endeavor from the leading female role in a musical comedy film. Nor is it plain to me that the rather qualified rights of director and screenplay approval contained in the first contract are highly significant matters either in the entertainment industry in general or to this plaintiff in particular. Certainly, none of the declarations introduced by plaintiff in support of her motion shed any light on these issues.[6] Nor do they attempt to explain why she declined the offer of starring in "Big Country, Big Man." Nevertheless, the trial court granted the motion, declaring that these approval rights were "critical" and that their elimination altered "the essential nature of the employment."

The plaintiff's declarations were of no assistance to the trial court in its effort to justify reaching this conclusion on summary judgment. Instead, it was forced to rely on judicial notice of the definitions of "motion picture," "screenplay" and "director" (Evid. Code, § 451, subd. (e)) and then on

---

[6]Plaintiff's declaration states simply that she has not received any payment from defendant under the "Bloomer Girl" contract and that the only persons authorized to collect money for her are her attorney and her agent.

The declaration of Herman Citron, plaintiff's theatrical agent, alleges that prior to the formation of the "Bloomer Girl" contract he discussed with Richard Zanuck, defendant's vice president, the conditions under which plaintiff might be interested in doing "Big Country"; that it was Zanuck who informed him of Fox's decision to cancel production of "Bloomer Girl" and queried him as to plaintiff's continued interest in "Big Country"; that he informed Zanuck that plaintiff was shocked by the decision, had turned down other offers because of her commitment to defendant for "Bloomer Girl" and was not interested in "Big Country." It further alleges that "Bloomer Girl" was to have been a musical review which would have given plaintiff an opportunity to exhibit her talent as a dancer as well as an actress and that "Big Country" was a straight dramatic role; the former to have been produced in California, the latter in Australia. Citron's declaration concludes by stating that he has not received any payment from defendant for plaintiff under the "Bloomer Girl" contract.

Benjamin Neuman's declaration states that he is plaintiff's attorney; that after receiving notice of defendant's breach he requested Citron to make every effort to obtain other suitable employment for plaintiff; that he (Neuman) rejected defendant's offer to settle for $400,000 and that he has not received any payment from defendant for plaintiff under the "Bloomer Girl" contract. It also sets forth correspondence between Neuman and Fox which culminated in Fox's final rejection of plaintiff's demand for full payment.

judicial notice of practices in the film industry which were purportedly of "common knowledge." (Evid. Code, § 451, subd. (f) or § 452, subd. (g).) This use of judicial notice was error. Evidence Code section 451, subdivision (e) was never intended to authorize resort to the dictionary to solve essentially factual questions which do not turn upon conventional linguistic usage. More important, however, the trial court's notice of "facts commonly known" violated Evidence Code section 455, subdivision (a).[7] Before this section was enacted there were no procedural safeguards affording litigants an opportunity to be heard as to the propriety of taking judicial notice of a matter or as to the tenor of the matter to be noticed. Section 455 makes such an opportunity (which may be an element of due process, see Evid. Code, § 455, Law Revision Com. Comment (a)) mandatory and its provisions should be scrupulously adhered to. "[J]udicial notice can be a valuable tool in the adversary system for the lawyer as well as the court" (Kongsgaard, *Judicial Notice* (1966) 18 Hastings L.J. 117, 140) and its use is appropriate on motions for summary judgment. Its use in this case, however, to determine on summary judgment issues fundamental to the litigation without complying with statutory requirements of notice and hearing is a highly improper effort to "cut the Gordion knot of involved litigation." (*Silver Land & Dev. Co. v. California Land Title Co.* (1967) 248 Cal.App.2d 241, 242 [56 Cal.Rptr. 178].)

The majority do not confront the trial court's misuse of judicial notice. They avoid this issue through the expedient of declaring that neither judicial notice nor expert opinion (such as that contained in the declarations in opposition to the motion)[8] is necessary to reach the trial court's conclusion.

---

[7]Evidence Code section 455 provides in relevant part: "With respect to any matter specified in Section 452 or in subdivision (f) of Section 451 that is of substantial consequence to the determination of the action: (a) If the trial court has been requested to take or has taken or proposes to take judicial notice of such matter, the court shall afford each party reasonable opportunity, before the jury is instructed or before the cause is submitted for decision by the court, to present to the court information relevant to (1) the propriety of taking judicial notice of the matter and (2) the tenor of the matter to be noticed."

[8]Fox filed two declarations in opposition to the motion; the first is that of Frank Ferguson, Fox's chief resident counsel. It alleges, in substance, that he has handled the negotiations surrounding the "Bloomer Girl" contract and its breach; that the offer to employ plaintiff in "Big Country" was made in good faith and that Fox would have produced the film if plaintiff had accepted; that by accepting the second offer plaintiff was not required to surrender any rights under the first (breached) contract nor would such acceptance have resulted in a modification of the first contract; that the compensation under the second contract was identical; that the terms and conditions of the employment were substantially the same and not inferior to the first; that the employment was in the same general line of work and comparable to that under the first contract; that plaintiff often makes pictures on location in various parts of the world; that article 2 of the original contract which provides that Fox is not required to use the artist's services is a standard provision in artists' contracts designed to negate any implied covenant that the film producer promises to play the artist in

*Something,* however, clearly *is* needed to support this conclusion. Nevertheless, the majority make no effort to justify the judgment through an examination of the plaintiff's declarations. Ignoring the obvious insufficiency of these declarations, the majority announce that "the deprivation or infringement of an employee's rights held under an original employment contract" changes the alternate employment offered or available into employment of an inferior kind.

I cannot accept the proposition that an offer which eliminates *any* contract right, regardless of its significance, is, as a matter of law, an offer of employment of an inferior kind. Such an absolute rule seems no more sensible than the majority's earlier suggestion that the mere existence of differences between two jobs is sufficient to render them employment of different kinds. Application of such per se rules will severely undermine the principle of mitigation of damages in the employer-employee context.

I remain convinced that the relevant question in such cases is whether or not a particular contract provision is so significant that its omission creates employment of an inferior kind. This question is, of course, intimately bound up in what I consider the ultimate issue: whether or not the employee acted reasonably. This will generally involve a factual inquiry to ascertain the importance of the particular contract term and a process of weighing the absence of that term against the countervailing advantages of the alternate employment. In the typical case, this will mean that summary judgment must be withheld.

In the instant case, there was nothing properly before the trial court by which the importance of the approval rights could be ascertained, much less evaluated. Thus, in order to grant the motion for summary judgment, the trial court misused judicial notice. In upholding the summary judgment, the majority here rely upon per se rules which distort the process

---

or produce the film; that it is not intended to be an advance waiver by the producer of the doctrine of mitigation of damages.

The second declaration is that of Richard Zanuck. It avers that he is Fox's vice president in charge of production; that he has final responsibility for casting decisions; that he is familiar with plaintiff's ability and previous artistic history; that the offer of employment for "Big Country" was in the same general line and comparable to that of "Bloomer Girl"; that plaintiff would not have suffered any detriment to her image or reputation by appearing in it; that elimination of director and script approval rights would not injure plaintiff; that plaintiff has appeared in dramatic and western roles previously and has not limited herself to musicals; and that Fox would have complied with the terms of its offer if plaintiff had accepted it.

of determining whether or not an employee is obliged to accept particular employment in mitigation of damages.

I believe that the judgment should be reversed so that the issue of whether or not the offer of the lead role in "Big Country, Big Man" was of employment comparable to that of the lead role in "Bloomer Girl" may be determined at trial.

Appellant's petition for a rehearing was denied October 28, 1970. Mosk, J., did not participate therein. Sullivan, J., was of the opinion that the petition should be granted.