[Civ. No. 16608. Fourth Dist., Div. One. Dec. 5, 1978.]

VERA E. LOREE, Plaintiff and Appellant, v.
ROBERT F. DRIVER CO., INC., et al., Defendants and Respondents.

## COUNSEL

Wallace R. Nugent for Plaintiff and Appellant.

Holt, Rhoades & Hollywood, Larry A. Shoffner and David J. Danielsen for Defendants and Respondents.

## OPINION

**STANIFORTH, J.**—Plaintiff Vera E. Loree's verified complaint sought $7,472.56 damages from insurance brokers Robert F. Driver Co., Inc. (Driver) and Ron Guy. Loree charges these defendants with a negligent failure to procure a Small Business Administration (SBA) "guaranty policy" to her consequential damage. Both the contractor and Summit

Insurance Company (Summit), performance bond surety on Loree's home construction project, defaulted on their contractual obligations requiring Loree to complete her home at a cost in excess of the contract price.

After responsive pleadings were filed, Driver and Guy moved for summary judgment on the premise of no triable issue of fact tendered by the pleadings. After consideration of the pleadings, memorandum of points and authorities and the declarations from both sides, the trial court granted the summary judgment and Loree's action was dismissed. Loree appeals pointing to the cause of action and triable issues of fact.

## FACTS

These facts are not in dispute. In January 1973 Loree entered into a contract with general building contractor Dyson for construction of a residence for Loree in Coronado, California, for a contract price of $51,120. The Bank of America made the construction loan conditional upon Dyson's obtaining a performance bond naming Loree and the bank as obligees. In March 1973 Dyson applied to Driver for a "payment and performance" bond in an amount equal to the contract price to be issued by Summit as surety. Driver sought out Guy, attorney in fact for Summit, to secure the policy.

Summit agreed to post the bond but as a condition precedent required the bond be further secured by an SBA guaranty (a "guaranty agreement under title IV part B of the Small Business Investment Act of 1958 as amended"). Upon Driver's demand (May 15, 1973) Loree paid Driver $863.24, the total premium due for both the Summit policy and the SBA guaranty. For reasons not here appearing, Summit issued its bond to Dyson without first obtaining the SBA guaranty contract. There is nothing showing that Loree was notified in some timely fashion of this failure to secure the SBA guaranty.

Upon issuance of the bond by Summit, the contractor forthwith commenced construction. In March of 1974 Dyson defaulted on his contract and stopped work on Loree's home. Summit was notified of Dyson's default and undertook to complete the house as required by the bond. Before completion, however, Summit was declared insolvent in a New York Supreme Court proceeding and has failed to carry out its surety obligations on Dyson's contract to complete Loree's home. As a

conŝequence Loree completed the house at a cost of $8,302.84 in excess of the contract price.

On August 29, 1974, 16 months after Loree had paid the dual premium, Guy notified Loree that the SBA guaranty agreement *had not* been obtained and returned the premium to Loree. The verified complaint alleges Summit "was in receivership" as of August 29, 1974.

The record in the New York Supreme Court proceedings involving the insolvency and liquidation of Summit shows Summit on May 28, 1975, had been declared insolvent; that an agreement was reached between the SBA and the "liquidator" of Summit on January 20, 1976, whereby the obligees on performance bonds issued by Summit *and* guaranteed by SBA received payment for 90 percent of their loss arising from their contractor's default under his performance bond.[1]

The controlling question is whether there is an issue of fact to be tried. ". . . If it finds one, it is then powerless to proceed further, but must allow such issue to be tried by a jury unless a jury trial is waived. By an unbroken line of decision in this state since the date of the original enactment of section 437c, the principle has become well established that *issue finding rather than issue determination is the pivot upon which the summary judgment law turns.* [Citations.]" (*Walsh* v. *Walsh,* 18 Cal.2d 439, 441 [116 P.2d 62]; italics added; *Blair* v. *Pitchess,* 5 Cal.3d 258, 284 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].)

As was stated in *Parker* v. *Twentieth Century-Fox Film Corp.,* 3 Cal.3d 176 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615], at page 181: "Summary judgment is proper only if the affidavits or declarations [fn. omitted] in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show facts sufficient to present a triable issue of fact."

■ In resolving the question of whether there was any factual issue to be tried, the trial court was obliged to construe the moving party's declarations strictly and those of Loree liberally to the end that the latter would not be summarily deprived of the full hearing which would be her due at the trial of this case. (*Freidberg* v. *Freidberg,* 9 Cal.App.3d 754, 761 [88 Cal.Rptr. 451].)

---

[1] Loree's claimed damage of $7,472.56 is 90 percent of $8,302.84 expended in excess of the contract price to complete her house.

The summary procedure is drastic and should be used with caution so that it does not become a substitute for· the open trial method of determining facts. We accordingly view the relevant facts as they tend to support Loree's cause of action and as they were presumably accepted by the trial court.

It is Loree's factual contention that the construction money lender (Bank of America) required a performance bond conditioned against the contractor's default to the end that there would be money available to complete the dwelling according to contract without loss to Loree. The surety in turn required Loree to procure and pay for an SBA guaranty bond. Loree states it was then the understanding of all parties that if a loss occurred by reason of the general contractor defaulting, the funds necessary to complete the work of improvement would flow from the United States government by and through the SBA, at least as to 90 percent of the cost required to complete the work of improvement.

In short, Loree contends the SBA guaranty was a reinsurance of Summit's bond. This view is inferentially supported in Guy's letter of August 29, 1974, returning Loree's premium payment where he stated "This bond [Summit's] was not *re-insured* by the Small Business Administration, therefore the charge is not applicable." (Italics added.) This notice to Loree was given *after* the conceded default of the contractor and the alleged insolvency of Summit.

Defendants deny Loree's factual assertions in this oblique fashion. They contend "[t]he SBA Guarantee did not, by its very terms, ever undertake to assure to *anyone* the solvency of the Surety." This assertion as to the meaning to be given to the SBA guaranty agreement may or may not be true, but it does not squarely meet or deny Loree's contention that she was billed for, paid for and did not get the reinsurance of the Summit bond. These oblique defenses do not negate Loree's charge of negligence in failure to provide reinsurance for her protection. Loree asserts she had an expectation of SBA's reinsurance of the Summit performance bond. She paid an additional premium in anticipation of a double protection upon the contractor's default—not only from Summit's bond but also from the United States government's reassurance of Summit's undertaking. ■ Here is a clear factual dispute concerning the circumstances of her paying for a bond premium she did not get. It cannot be resolved by the summary judgment process. She is entitled to a hearing on the factual issues so framed.

The statement of the California Supreme Court in *Barrera* v. *State Farm Mut. Automobile Ins. Co.,* 71 Cal.2d 659, 673 [79 Cal.Rptr. 106, 456 P.2d 674], lends legal substance to Loree's factual position.

"California has developed a line of decisions imposing a duty upon all insurers to act promptly upon an application for insurance. The rationale underlying the extra-contractual imposition of this duty parallels the philosophy underlying the Financial Responsibility Law and related statutory and judicial rules governing automobile liability insurance.

"The rule that an insurer must act promptly finds its source in the quasi-public nature of the insurance business and the reasonable expectation of the applicant and the general public. 'Since insurance companies are held to a broader legal responsibility than are parties to purely private contracts, having solicited and obtained an application for insurance, and having received payment of a premium, they are bound either to furnish indemnity or decline to do so within a reasonable time.' (12 Appleman, Insurance Law and Practice, *supra,* § 7226, at p. 330; see also Funk, *The Duty of an Insurer to Act Promptly on Applications, supra,* 75 U.Pa.L.Rev. 207, 222, 224.)" (See also *Snyder* v. *Redding Motors,* 131 Cal.App.2d 416, 422 [280 P.2d 811]; *Smith* v. *Minnesota Mut. Life Ins. Co.,* 86 Cal.App.2d 581, 584 [195 P.2d 457]; *Stark* v. *Pioneer Casualty Co.,* 139 Cal.App. 577, 580 [34 P.2d 731].)

Defendants respond to these factual charges and legal propositions with this further assertion: "proximate cause is the true issue." They assert that the SBA guaranty agreement was not intended to protect anyone but surety companies such as Summit. They argue that a reading both of the statute setting up the SBA guaranty program[2] and the guaranty agreement[3] demonstrates that the SBA does not guarantee the solvency of a surety to anyone; that the only thing guaranteed was 90

---

[2]The statute authorizing the creation of the SBA Guaranty Program is found at 15 United States Code Annotated section 694a et seq. The purpose of the Guaranty Program is found in section 694b where the code states in part: "(a) The Administration may . . . guarantee and enter into commitments to guarantee any surety against loss . . . subject to the following conditions: (1) The person who would be the principal of the bond is a small business concern. (2) The bond is required in order for such person to bid on a contract, or to serve as a prime contractor or subcontractor thereon. (3) Such person is not able to obtain such bond on reasonable terms and conditions without a guarantee under this section."

[3]        "GUARANTEE AGREEMENT UNDER TITLE IV, PART B, OF THE
            SMALL BUSINESS INVESTMENT ACT OF 1958, AS AMENDED
    "This agreement, made and entered into this . . . by and between the Small Business Administration, . . . and . . . as Surety, relative to . . . as Principal, who has applied for

percent of any loss suffered by a surety that has been brought about in a classic bond fashion.

Defendants further argue the clear import of the statutory language shows a scheme to encourage surety companies to bond small building contractors who might not otherwise bond; or if they did bond, then it would be at rates the small contractor could not afford to pay. The defendants contend the SBA was guaranteeing only the surety against loss brought about by bonding of a small contractor who later defaulted. They point out the absence from the statute of any discussion of the rights of the obligee on the bond. Under the federal law, defendants assert, the obligee did not have a role in the SBA guaranty program.

With respect to the SBA guaranty agreement itself, defendants point to the specimen contract "by and between" the SBA and the surety. The principal, although referred to, is not a party to the guaranty nor is the obligee named in the agreement. Concerning that agreement defendants assert [Loree] "had no particular understanding of the guaranty either generally or specifically."

Finally defendants assert that the agreement of January 20, 1976, between the "liquidator" and the SBA *substantially altered* the manner in which the bond guaranty program operated between the parties to that

---

bonds required for . . . [describe project] . . . .

"WITNESSETH: . . . the parties agree as follows:

"1. Surety agrees, conditional on the execution of this guarantee by SBA, to become surety on the bid bond and if Principal's bid price is in line with other bidders in Surety's opinion and the contract price does not exceed $500,000, to become surety on performance, payment, maintenance, or any other bonds necessary or incidental to the performance of the above-described contract executed on behalf of the Principal. . . .

". . . . . . . . . . . . . . . . . . .

"3. Surety affirms that without this SBA guarantee to Surety it will not issue any of said bonds to Principal.

"4. SBA hereby agrees to guarantee to Surety 90% of any 'loss' Surety may sustain or incur in good faith by reason of its execution of the bid, payment or performance bond contemplated by this Agreement.

"5. SBA agrees that the term 'loss' as used in this Agreement shall mean any and all liability, damages, court costs, counsel fees, charges and expenses of whatever kind or nature which the Surety shall or may, at any time, sustain or incur by reason, or in consequence, of having executed the bond or bonds herein guaranteed by SBA.

". . . . . . . . . . . . . . . . . . .

"8. Surety agrees that if any suit or claim is brought or instituted against Surety upon said bond or bonds, Surety shall inform SBA of the same within a reasonable time of receipt of the summons and complaint or claim in the Surety's home office. . . .

". . . . . . . . . . . . . . . . . . .

"10. Surety agrees to pay SBA 10% of its bond(s) premium for and in consideration of SBA's agreement to guarantee the bid, payment or performance bond contemplated by this Agreement. . . ."

agreement. The liquidator in the January 20, 1976, agreement further agreed to present various claims to the SBA for approval, and if the claims were approved, the liquidator would pay 90 percent of the claim to the obligee on the bond. The SBA would then immediately reimburse the liquidator for the amount paid. The net result according to defendants of this modification was to keep intact the assets of Summit for the distribution to *other* creditors. Finally, it is urged that the modification of the agreement called for the liquidator to process, to pay those claims where *"co-incidentally"* the guaranty had been purchased.

The difficulty with defendants' defense—reliance upon a contract where it is claimed Loree is not a beneficiary thereof—is that it does not directly respond to Loree's factual contention. Defendants claim Loree had no particular understanding or need of understanding of the SBA guaranty since it was not for her benefit. She claims to the contrary.

Moreover, defendants' tender of the contract of guaranty and the federal statute raises further questions concerning the propriety of disposition of Loree's claim by granting of a summary judgment. An examination of the language of the statute and of the specimen contract does not leave the reader with that same sense of security as to meaning as defendants here contend. Aside from a patent lack of clarity in the language as to the rights of the parties for whose benefit inferentially at least the guaranty was made, we face here certain uncomfortable facts that belie defendants' contention as to its meaning. Loree paid an excess premium at defendants' request for some form of additional insurance protection, presumably for *her* protection since she was asked for and did give the consideration. Although the contract may be between the SBA and the prime surety only, yet it is difficult to avoid that insistent, nagging inference that the underlying, the ultimate purpose of that SBA guaranty was to protect the homebuilder if the marginal surety went broke. There is a further and uncomfortable fact. The parties to a similar SBA agreement have construed (defendants contend substantially altered) it in accord with Loree's contention as to her understanding of its meaning. Moreover the interesting language used by Guy, in his August 29, 1974, letter, was in the nature of an admission as to the correctness of Loree's contention as to the contract's meaning.

■ When the meaning of the language of a contract is doubtful or uncertain and parol evidence is introduced in aid of its interpretation, "the question of meaning is one of fact." (*Walsh* v. *Walsh, supra,* 18 Cal.2d 439, 441.) The contract here involves parties not in this lawsuit; yet

its language is sufficiently broad, uncertain in its meaning to require an examination into extrinsic circumstances to ascertain the intent of the parties. In such circumstances it is the primary duty of the trial court to construe the language after a full opportunity afforded to all parties in the case to produce evidence of facts, circumstances and conditions surrounding its effect and the conduct of the parties relating thereto. (*Barlow* v. *Frink,* 171 Cal. 165, 172-173 [152 P. 290].) Such duty is not performed, cannot be performed by the summary judgment procedures.

Judgment reversed.

Brown (Gerald), P. J., and Harelson, J.,* concurred.

A petition for a rehearing was denied December 21, 1979.

---

*Assigned by the Chairperson of the Judicial Council.