## HEIFERMAN v. GREENHUT CLOAK CO.

(City Court of New York. Trial Term. June, 1913.)

1. MASTER AND SERVANT (§ 47*)—WRONGFUL DISCHARGE OF SERVANT—OFFER OF REINSTATEMENT.

Where a master's bona fide offer to reinstate an employé, wrongfully discharged, was met by arbitrary demand for the discharge of a certain other employé, the discharged servant was not entitled to damages.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 47.*]

2. NEW TRIAL (§ 77*)—VERDICT BASED ON SYMPATHY OR PREJUDICE.

A verdict which must have been based on sympathy or prejudice, and not on the evidence or the charge, cannot stand.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 157–161; Dec. Dig. § 77.*]

Action by Frank Heiferman against the Greenhut Cloak Company. Verdict for plaintiff, and defendant moves for new trial. Motion granted.

Charles Tolleris, of New York City, for plaintiff.
Henry B. Singer, of New York City, for defendant.

FINELITE, J. This action is brought to recover damages for an alleged wrongful discharge.

The plaintiff and defendant entered into articles of agreement, dated the 18th day of July, 1911, wherein the defendant agreed to employ the plaintiff as a designer and general superintendent in the cloak and suit business that the defendant was trading in and manufacturing, for a period of one year from October 15, 1911, till the 15th of October, 1912, at a yearly salary of $7,000, payable in weekly installments of $134.62.

The plaintiff entered the employ of the defendant at his place of business in the city of Cleveland, in the state of Ohio, and remained in said employment until about the 2d day of December, 1911, and on said day the plaintiff contends that the defendant, without just cause or legal ground therefor, discharged the plaintiff of and from said employment, and since then has refused and still refuses to continue plaintiff in said employment, or to pay him the salary and compensation provided for in said agreement.

The answer of the defendant denies the discharge and alleges affirmatively by way of defense that the plaintiff voluntarily abandoned the employment, and further alleges, upon information and belief, that subsequent to the 2d day of December, 1911, and on and between the 4th day of December, 1911, and the 12th day of December, 1911, the defendant on a number of occasions offered to take back the plaintiff in his employ, pursuant to the terms of the agreement, and that the said plaintiff refused to re-enter the employ of the defendant and to continue in the employ of the defendant under and pursuant to the terms of said agreement.

The plaintiff admitted that from the date of the alleged discharge down to the trial of the action he had earned the sum of $4,873.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

The jury awarded the plaintiff a verdict for the sum of $2,000, being the difference between the amount earned and the stipulated salary.

The defendant immediately moved to set aside the verdict upon the grounds enumerated in section 999 of the Code, which motion was entertained by the court.

The alleged discharge, as contended by the plaintiff, was to the effect: That, while said plaintiff was in the performance of his duties as such designer, an altercation was had between him and Mr. Greenhut, the president of defendant's corporation, wherein said plaintiff was instructed by said Greenhut to try to finish up as many samples as possible on that day of a certain design that he was then working on. That this was on Saturday, December 2, 1911. That thereupon Mr. Greenhut went to his luncheon, and so did the plaintiff. That on his return from luncheon Mr. Greenhut was in the sample room and he was "hollering at the tailors," and that as the plaintiff came in he asked Mr. Greenhut, "What is the matter, what is wrong?" and:

"He started hollering at me, saying: 'What kind of management is this? You take one of my most expensive tailors sewing on buttons, when a girl at $6 a week can do that.'" That "I told Mr. Greenhut that the girls upstairs had gone, and you asked me to finish up the garments; what else can I do? I think that is the best I can do. You told me to finish up the garments. He says: 'I don't want that kind of management; I won't stand for it.' Then he started to holler at me, and he insulted me, and, of course, I answered back. He says, 'I don't want that kind of management, and I don't want that to happen again.' Of course, I answered him back in the same kind of words; I don't remember exactly what I answered him. He says, 'If I would not want to dirty my hands on you, I would box your ears.' When he said that, of course, I answered him back. I told him his place is not to interfere, and if he wants I should finish out the garments he should leave me alone. He then said: 'I can't use you. Get out of here. Get out!' That is all. He told me: 'I can't use you. Get out. Get out. I did not sell the place to you.' He says, 'Get out,' and I went, and I did not go back that afternoon."

The plaintiff claimed, on direct examination, that he was discharged on Saturday, December 2d, and that he returned to the city of New York on Sunday morning, December 3d. On this he was questioned:

"Q. When did you get back? A. Sunday morning.

"Q. When did Mr. Pollak see you? (Pollak was the vice-president of defendant's company.) A. I believe Monday or Tuesday.

"Q. Monday, wasn't it? A. Yes, sir; Monday."

It appears from the evidence that when Mr. Greenhut discovered that the plaintiff had left the city of Cleveland he immediately telegraphed on to the vice president of the said corporation, who was then stopping in the city of New York, to immediately call upon the plaintiff and have him return to Cleveland and continue his work under said agreement, on which said plaintiff was interrogated as follows:

"Q. And where did he meet you? A. In my house; no, I think in Levy & Reif's.

"Q. He asked you to come back, didn't he? A. Yes; he asked me to come back.

"Q. And you said you would let him know, didn't you? A. I told him I was going to let him know.

"Q. That was only two days after you had left? A. Yes.

"Q. And he came back to your house, didn't he? A. Yes.

"Q. And he spoke to your wife, didn't he? A. Yes, sir.

"Q. And he asked you there to come back, didn't he? A. Yes.

"Q. You believe that Mr. Pollak was a gentleman, don't you? A. I believe he is a gentleman.

"Q. And you believe he was sincere when he asked you to come back, didn't you? A. Yes.

"Q. He really meant it? A. Yes, sir.

"Q. And you told him what? A. I told him if they will discharge Mr. Kerstein and will live up to the contract I will go back.

"Q. What right did you have to ask to have another man discharged who was under contract? (Objection. The word 'right' was changed to the word 'reason' by the court.) A. I made a contract with Mr. Greenhut I would be the only designer there.

"Q. Well, look at your contract and tell me whether that says that you are to be the only designer. A. General Superintendent (see minutes, page 42).

"The Court: Is there anything in the contract whereby plaintiff was to be the only designer? (Plaintiff's counsel answers 'No.' See minutes, page 45.) * * *

"Q. In any event your answer was that you would not come back unless Kerstein was discharged? A. Yes, sir.

"Q. Any question at that time about paying your expenses—did they offer to do that? A. They didn't say anything about expenses.

"Q. There was no question at that time about any loss of salary, because it was the very next day? A. It was not mentioned.

"Q. They were sincerely anxious to get you back, and you refused to go back unless Kerstein was discharged? A. Yes. (See minutes, p. 46.) * * *

"Q. Mr. Pollak saw you again after that, didn't he? A. Yes, sir.

"Q. When was that? A. The following day, I believe (Thursday).

"Q. And he again asked you to come back, didn't he? A. Yes.

"Q. And you refused? A. Refused, and told him if he will send away Mr. Kerstein I will go back.

"Q. What did he tell you about Kerstein? A. He said they could not send away Kerstein because he had a two-year contract—it is impossible. (See minutes, p. 51.)

"Q. Did you receive this letter about the 6th of December? A. Yes, sir.

"Q. Now, following that letter, you and your lawyer had some interviews with Mr. Singer (defendant's attorney)? A. Yes, sir.

"Q. He asked you to come back? A. Yes, sir.

"Q. And you refused unless they discharged Kerstein? A. Yes, sir.

"Q. They told you they were under contract with Kerstein, did they not? A. Yes.

"Q. And that they could not discharge him without breaking their contract? A. Yes, sir.

"Q. You got back to New York on December 2d? A. Yes, sir.

"Q. And you continued these conferences right through the week of December 2d? A. Since I received that letter from Mr. Singer.

"Q. And the designers who are good designers make their contracts along in May or June? A. May to October.

"Q. And you make your contracts, if you are good people, for the entire year? A. Yes, sir.

"Q. And along about November and early part of December is just about the important part of the year, isn't it, for a designer? A. Yes, sir.

"Q. That is the time salesmen have to go on the road? A. Yes.

"Q. Time to make samples? And if the salesmen are delayed for a week or two, it may make a vast difference, isn't that right? A. Yes, sir.

"Q. You continued these stalls from December—from December 2 until December 11, did you not, when your lawyer received a certain letter, of which I show you the original? A. Yes, sir.

"Q. That was nine days after? A. Yes, sir; that was it. (See minutes, p. 52.) * * *

"Q. Didn't you say at the last trial that both Mr. Greenhut and Mr. Pollak were gentlemen, and that they treated you like gentlemen? A. Gentlemen, positively, and I don't say they are not gentlemen.

"Q. And they did treat you like gentlemen? A. Yes, they had to treat me.

"Q. Not what they had to do; didn't you say they treated you like a gentleman? A. Yes, they treated me.

"Q. Didn't you testify that Mr. Greenhut went so far as to invite you to dine with him at the clubs? A. Yes.

"Q. And on Thursday, before you left on that Saturday, you were at. dinner with Mr. Greenhut at that same club? A. Yes.

"Q. And that he was trying to make it pleasant for you? A. Yes, sir.

"Q. And that he was introducing you all around to all the people? A. Yes, sir. (See minutes, p. 35.) * * * "

It further appeared from the cross-examination of the plaintiff that from the arrival of said plaintiff at Cleveland, Ohio, he resided in a furnished room, and that at no time was his trunk unpacked, and that he had a wife and family residing in the city of New York.

[1] The only question to be decided here is: Was the offer genuine and bona fide for the re-employment of the plaintiff on the very day after the alleged discharge? It is not disputed from the facts herein that the offer was followed up by Mr. Pollak visiting the plaintiff's home, where the plaintiff and his wife were requested to come along with him to Cleveland, and that the only objection then made by the plaintiff was that he was unable to get along with Kerstein. He insisted, as a condition of his return, that Kerstein should first be discharged from the employment of the defendants. At the time that the offer for the re-employment was made to the plaintiff, he had not then suffered any loss, and, on his failure to accept the re-employment, was it not his duty to immediately return to the defendant and re-enter his employ? The rule is well stated by Sutherland on Damages (volume 3, § 693) as follows:

"But an offer to continue in the same employment, under the terms of the original contract, if nothing has occurred to make it *degrading for the employé to do so*, or he will *not suffer loss or injury thereby, must be accepted*. If it is refused, he cannot recover for such time as he thereafter remains unemployed."

It is contended on behalf of the plaintiff that he was willing to return to Cleveland, to be re-employed by the defendant, under and pursuant to said contract, if the said defendant would pay him the expenses then incurred, which were, i. e., the railway fare from Cleveland to New York, and also his railway fare from New York to Cleveland, and that by reason of the defendant refusing this offer he was justified then, under the circumstances, to consider that he was discharged from the defendant's employ, and that he thereafter sought other employment to diminish the damages for the breach of said contract. Although it was his duty, under the law, to seek other employment to diminish the damages, the court cannot· overlook the offer made by the defendant immediately upon the alleged discharge of the plaintiff, to return to his original employment, and on his failure to return to Cleveland and accept his original employment, it has been held that the only damages that plaintiff could recover would be nominal. From research made, I find that the authorities are few covering

this proposition, but it has been held in other jurisdictions that, where A. engaged B. to work for him for 12 months, at $50 a month, and at the end of the month discharged him, offering $50 for that ·month in full settlement, which was refused. On the same or next day A. requested B. to return to the store and work, which B. refused to do. Held, that this refusal barred B.'s recovering more than $50. Birdsong v. Ellis, 62 Miss. 418.

The case of Kuno v. Fitzgerald Bros. Brewing Co., 65 App. Div. 612, 72 N. Y. Supp. 742, is analogous to the question here discussed, in reference to the request of the plaintiff herein that he would return to his employment after the discharge of Mr. Kerstein; in said case last cited, where an employé persistently refused to continue his employment unless certain unauthorized expenses were acceded to, and wherein a statement of the manager that he was through with his employé's services did not amount to a breach of the contract by the employer, the same having already been broken by the employé; and on page 613 of 65 App. Div., and page 744 of 72 N. Y. Supp., Ingraham, J., writing for the court, quoting the trial court's charge, states:

"The question submitted by the court to the jury was: 'What is the fact? Was it the breach of the defendant, or did he discontinue his services, for the reason I have stated, because of the nonpayment of the expenses, etc.? If the latter, then your verdict should be for the defendant. If the defendant was guilty of a breach of contract, and the plaintiff was ready and willing at all times to fulfill the contract on his part, then he is entitled to a verdict, and the measure of damages is as I have indicated to you already.'

"Thus the court eliminated from the consideration of the jury the only breach of the contract alleged in the complaint, and, upon which the plaintiff based his right to a recovery by holding that a correct construction of the contract did not require that the defendant should furnish the plaintiff with these expenses, and that refusal of the defendant to furnish the expenses was not a breach of any contract they had made. But the plaintiff obtained a recovery because of a breach of a contract which was not alleged, and which a review of the evidence shows was not proved.

"Plaintiff admitted in his testimony, confirming by his letters and telegrams to defendant, that he had demanded of the defendant that he should be paid these expenses; that the plaintiff had refused to waive his demand for them, and had refused to continue in the employment, unless that demand was acceded to. It was offered in support, after the plaintiff had persistently refused to go on with the employment unless the defendant agreed to pay him for these expenses, that defendant's manager told him, 'We are through with you.' And certainly, in view of the plaintiff's persistent refusal to continue in the defendant's employ unless this demand, which was entirely unjustified, was acceded to, such a statement cannot be considered a breach of the agreement of employment by the defendant. I think it quite clear that, upon the plaintiff's own evidence, he was guilty of a breach of his contract, by demanding to be paid these expenses, to which, under the contract, he was not entitled, and refusing to proceed under the contract unless the claim was allowed."

The court further states that from the evidence as presented the plaintiff was not entitled to recovery, and the complaint should have been dismissed. The case was thereupon reversed and a new trial ordered.

Bigelow v. American Forsythe Powder Mfg. Co., 39 Hun, 599, seems to be in point. Davis, P. J., states as follows:

"I think, notwithstanding what has taken place between the parties, the plaintiff having found no other employment, was bound to be called upon after the alleged breach to perform any services within the employment called for by defendant's contract. He claims for the *entire year's services*, because by the contract he was employed for a year, and was required by the rule governing such cases to take employment when opportunity offered, *practically for the benefit* of the defendant, and to give credit on his admissions for the amount he should earn. It was the right, therefore, for the defendant to call upon him to serve in the same line of business as the original employment, or to provide employment for him, and his refusal to take such service without any good reason should operate to diminish his damages."

The request of the plaintiff to discharge Kerstein as a condition for him to return to the employment of the defendant under his said contract appears to be arbitrary and capricious, and the refusal to re-enter into his employ upon such condition cannot be construed as a legal ground for a breach of the contract of employment.

The court, in its charge to the jury, stated:

"That it appeared from the evidence that the defendant employed quite a number of salesmen and had a large plant for the manufacturing of cloaks and suits, and had the right to employ as many designers as it found it was necessary for the benefit of its business."

The excuse offered by the plaintiff and his insistence on the discharge of Kerstein were not in good faith, and the verdict rendered by the jury was not in accordance with the court's charge, to which no exception was taken, nor was it in accordance with the evidence adduced upon the trial.

It is only in such cases where a plaintiff would be excused from returning to employment under an offer of re-employment, wherein it might degrade and humiliate the employé, or where an employé must associate in the performance of his work with persons of habitually immoral character or loose manners, which would be a sufficient ground upon discharge from employment to maintain action to recover for the amount due, less the amount earned. Levin v. Standard Fashion Co., 16 Daly, 404, 11 N. Y. Supp. 706, and cases there cited.

This is the only instance that the court could find from research made excusing an employé from entering upon re-employment under a contract existing between the parties.

The court has examined the cases Pindar v. Jenkins, 128 App. Div. 711, 113 N. Y. Supp. 589, and Ruland v. Waukesha Water Co., 52 App. Div. 280, 65 N. Y. Supp. 87, but fails to see where they are applicable to the question involved here.

[2] The court can come to but one conclusion, and that is that the verdict of the jury thus rendered in favor of the plaintiff must have been reached by bias, prejudice, or sympathy for the plaintiff and not in accordance with the evidence or the court's charge, and a verdict thus rendered cannot stand, and the motion to vacate the same and ordering a new trial is therefore granted.

Settle order on one day's notice.