SCHILLER, Appellant, v. KEUFFEL & ESSER COMPANY, INC., Respondent.

*October 30—November 26, 1963.*

546

548

For the appellant there were briefs by *Bender, Trump, Davidson & Godfrey,* attorneys, and *Kneeland A. Godfrey* and *Thomas W. Godfrey* of counsel, all of Milwaukee, and oral argument by *Thomas W. Godfrey.*

For the respondent there was a brief by *Quarles, Herriott & Clemons,* attorneys, and *James C. Mallien* of counsel, all of Milwaukee, and oral argument by Mr. *Mallien.*

FAIRCHILD, J. 1. *The testimony.* "A verdict should only be directed against a plaintiff where plaintiff's evidence, giving it the most-favorable construction it will reasonably bear, is insufficient to sustain a verdict in plaintiff's favor." [1]

Applying the rule just stated, we may summarize the substance of Mr. Schiller's testimony as follows:

The bulk of Schiller's business came from 20 concerns. Schiller had customarily called on the individuals in charge of purchasing, mainly for the purpose of maintaining goodwill. He did not often take orders because in that type of business the customer orders materials or equipment as

[1] *Rudzinski v. Warner Theatres* (1962), 16 Wis. (2d) 241, 243, 114 N. W. (2d) 466; *Baumgarten v. Jones,* ante, p. 467, 124 N. W. (2d) 609.

needed. His goodwill operations consisted mainly of taking customers to lunch, ball games, and the like.

After the transfer a Mr. Berchim was in charge and a Mr. Zinny was sales manager. Schiller presented himself at the office in January, 1959, and asked for instructions as to his duties, but received none. Later, on his own initiative, he commenced calling on his old customers and endeavored to promote their goodwill toward K & E. Berchim and Zinny were hostile toward him; they failed to inform him as to difficulties which arose in filling orders from the customers on whom he called; he learned of these things from the customers, and the lack of co-operation from Berchim and Zinny embarrassed him. Schiller quoted list prices to customers, and Berchim and Zinny failed to inform him that they were quoting reduced prices to others on similar transactions. Schiller was available, and rendered considerable service on his own initiative during eight months of 1959, but was absent because of a trip, and later because of illness in the last part of 1959.

He was available for work at all times in 1960, but was not asked to perform any duties. In May, 1960, he talked with K & E's Chicago branch manager, whose territory included Wisconsin. They discussed the Milwaukee situation and Schiller said he would do anything the branch manager wanted him to do. The latter indicated there would be a change in the management at Milwaukee. Schiller received no further word until the branch manager told him his contract would be canceled.

Mr. Schiller testified on adverse examination that he did not do very much for K & E in January, 1960, and nothing thereafter; that this was of his own choice; that nothing but the lack of co-operation prevented him from coming to work or calling on customers.

2. *The contract.* All the documents, *i.e.,* the letter setting forth the "basic plan," the attached proposed recital and

resolution, and the form ultimately adopted, were prepared by officers or employees of K & E. To the extent of any doubt of meaning, the documents may be construed most strongly against the party preparing them.[2]

The agreement provided separately for payment for the inventory and equipment. Apart from the employment agreement, Schiller promised to visit former customers and encourage them to do business with K & E. It is a reasonable construction that this obligation was to be performed at and as soon as possible after the time of the transfer, in order that K & E might succeed to as much of the customers' goodwill as possible, and that the obligation did not require repeated visits extending into the future. So construed, the obligation was fully performed.

This action is concerned solely with the extent of services required of Schiller in order to entitle him to payment of salary under the employment portion of the agreement. Although his capacity was described as sales representative, and the services to be rendered as promotion of sales to past and prospective customers, every reference thereto was coupled with the qualification that he was to work "under the direction of the management," "as he may be directed," "as directed," "all as directed by the local management," and "under the direction of the local manager." It seems to us a reasonable construction of this contract that Schiller was entitled to the salary as long as he was willing and able to perform services in at least eight months of each calendar year and substantially performed all services that the management, within reason, directed him to perform.

This construction would make Schiller's employment a sinecure in the absence of direction by the management as to his duties. Such an arrangement would seem unusual, and

---

[2] *Hoffmann v. Danielson* (1947), 251 Wis. 34, 39, 27 N. W. (2d) 759; *Skelly Oil Co. v. Peterson* (1950), 257 Wis. 300, 306, 43 N. W. (2d) 449; 12 Am. Jur., Contracts, p. 795, sec. 252.

this construction strained, under other circumstances. Here, however, the contract to employ Schiller was part of the inducement for Schiller to transfer the goodwill which his past activity had created. In this context it is not improbable that the parties contemplated that his regular and full-time services would not be needed and that he was obligated to perform services only as called upon. We are aware that similar contracts are not infrequent under comparable circumstances.

In order for K & E to justify its termination of the contract as so construed, it must show either (1) that Schiller was not willing or able to perform, or (2) that duties had been assigned to him which he failed substantially to perform.

Although the testimony might have supported an inference that Schiller's actions had made it evident in early 1960 that he had decided not to render further services, whether or not requested, the testimony could also support the inference that no direction was given to him as to his duties, lack of co-operation made it difficult for him to perform services undertaken on his own initiative, and in May, 1960, he expressed his willingness to perform as might be requested.

We conclude there was an issue for the jury and a verdict should not have been directed.

3. *Mitigation of damages.* K & E did not allege that Schiller failed to seek other employment after discharge, nor that other comparable employment was available to him. K & E offered Schiller's testimony on adverse examination that he did not seek such employment.

" 'If a person hired for service for a given term is wrongfully dismissed he is entitled to the stipulated wages for the term of his engagement if that is his loss. It is *prima facie* his loss; but the law imposes upon him the duty to seek other employment; and to the extent that he obtains it and

earns wages, or might have done so, his damages will be reduced.' " [3]

The discharged employee is not obliged to seek or accept other employment of a different or inferior kind in order to minimize damages.[4]

The burden of pleading the mitigation issue is upon the defendant.[5]

"Moreover, it is not sufficient to plead merely neglect to seek for employment, unless the circumstances are such that it must be presumed that employment was obtainable by exercise of reasonable diligence." [6]

Schiller was sixty-nine or seventy years of age when the contract was terminated. The terminated contract required him to work only at the direction of the management, and not more than eight months per year. His experience for many years had been in this particular field. It cannot be presumed from these circumstances that comparable employment was available to him. Schiller's admission that he did not seek other employment does not justify the direction of a verdict against him.

4. *Further proceedings.* As already pointed out, the testimony would support the inference that by 1960 Schiller had decided that he would not render service to K & E if requested and that K & E so understood. If the jury so found,

[3] Sutherland on Damages (3d ed.), sec. 88, as quoted in *Gauf v. Milwaukee Athletic Club* (1912), 151 Wis. 333, 336, 139 N. W. 207. See also *Gordon v. Brewster* (1858), 7 Wis. 309 (*355), 317 (*363).

[4] *Mitchell v. Lewensohn* (1947), 251 Wis. 424, 432, 29 N. W. (2d) 748.

[5] *Barker v. Knickerbocker Life Ins. Co.* (1869), 24 Wis. 630, 634; *Monroe County Finance Co. v. Thomas* (1943), 243 Wis. 568, 572, 11 N. W. (2d) 190. See Anno. 41 A. L. R. (2d) 955.

[6] *Gauf v. Milwaukee Athletic Club, supra,* p. 335, footnote 3.

Schiller could recover nothing. Accordingly the merits can be determined only by a new trial.

In this connection, we may repeat a statement in an earlier case:

"It is to be regretted that the circuit court did not reserve its ruling on the motion for directed verdict until after the jury had returned its special verdict. By so doing, even though the court after the return of the verdict did see fit to have granted the motion, there would now be no necessity of granting a new trial. We do not advocate that such procedure invariably be followed, but in close cases we deem it to be preferable." [7]

*By the Court.*—Judgment reversed, cause remanded for a new trial.

---

[7] *Davis v. Skille* (1961), 12 Wis. (2d) 482, 490, 107 N. W. (2d) 458.

