**Joseph P. INGRASSIA, Plaintiff,**

v.

**SHELL OIL COMPANY, Defendant.**

**No. 73 Civ. 417.**

United States District Court,
S. D. New York.

May 15, 1975.

---

Howard F. Cerny, New York City, for plaintiff.

Northrop & Jessop, New York City, for defendant; Leon S. Harris, Irvin Slifkin, New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

This is an action by the above-named plaintiff Joseph P. Ingrassia (hereinafter "Ingrassia") against defendant Shell Oil Company (hereinafter "Shell") for alleged damages by reason of the fact that defendant Shell, in the period from August 1969 to July 15, 1971, moved its head office in connection with which plaintiff was employed from New York City to Houston, Texas and agreed to make certain special severance payments to those of its employees, including plaintiff, who did not relocate to Houston but continued to work for defendant in New York until their services were no longer needed, and in addition were not terminated for cause or did not refuse an offer of a roughly equivalent position with defendant in New York; that plaintiff in reliance upon this promise continued to work until his services were no longer required and that defendant thereafter failed, upon demand, to make such payments, alleging damages in the amount of $25,000 plus counsel fees, interest, etc. Defendant contends it never agreed to pay severance pay to plaintiff, that plaintiff was offered a roughly equivalent position in the New York area and is, therefore, not entitled to severance pay or any other damages.

The case was originally tried before Judge Metzner of this court and a jury The jury were unable to agree. Thereafter the case was assigned to the undersigned. Upon conferring with the attorneys for the respective parties, counsel agreed that the case should be tried by the court, without a jury, both sides waiving a jury. Consequently, this court has the duty of attempting to determine a factual and legal question on which the jury were unable to agree.

After hearing the testimony of the parties, examining the exhibits and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. This court has jurisdiction over the subject matter and parties to this action. 28 U.S.C.A. § 1332.

2. At all times relevant herein, plaintiff was a citizen of the State of New York. Defendant is and was at the time of the commencement of this action a foreign corporation organized under the laws of the State of Delaware, maintaining its principal place of business in Houston, Texas, and the amount in controversy exceeds $10,000, exclusive of interest and costs.

3. Plaintiff was employed by defendant Shell at its head offices in New York City from 1951 until July 15, 1971. (Tr. 3.) [1]

4. From 1956 until July 15, 1971, plaintiff held the position of Senior Representative—National Sales in defendant's Marketing Department, Fleet and National Sales. This position was also referred to within the company, informally, as "national coordinator, fleet sales," and this position fell under the broad classification of "head office representative." (Tr. 3, 4, 13, 94, 127, 162.)

5. In July 1969 defendant decided to transfer most of its operating organizations and their supporting elements from New York City to Houston, Texas. Among those being relocated were the offices of defendant's Marketing organization. (Pl. Ex. 1; Tr. 13, 14.) At that time, defendant estimated the number of jobs to be transferred at approximately 2,000. (Tr. 176.) In the period of July and August, 1969 defendant had not decided when such transfers would

---

[1]. Numbers in parentheses preceded by "Tr." refer to the stenographic minutes of the trial before this court on January 24, 1975; numbers in parentheses preceded by "Pl. Ex." refer to plaintiff's exhibits.

be made, except that relocation would take place largely during the last six months of 1970. (Pl. Ex. 1.) At that time, defendant did not know whether all departments would be asked to transfer. (Tr. 164, 175.) At that time, defendant contemplated that corporate headquarters and the executive offices of some of the operating organizations would remain in New York. (Pl. Ex. 1; Tr. 165.)

6. On August 12, 1969 defendant promulgated a memorandum to its head office managers informing them of its decision to relocate to Houston, Texas. (Pl. Ex. 1.) The memorandum contained information about the move and employee benefits. This information was to be given to the employees by the managers following a general announcement to all employees on August 14, 1969. (Pl. Ex. 1; Tr. 175, 176, 177, 178.) In this memorandum defendant established a severance pay policy for those employees whose positions were to be transferred to Houston but who, for various reasons, would not themselves be relocated to Houston, upon condition, however, that they remain on the job in New York City as long as needed by defendant. The pertinent part of the memorandum (Pl. Ex. 1) is as follows:

"II. SPECIAL PAYMENTS

In view of the considerable time lag between announcement and actual relocation, serious manpower shortages can develop in New York if employees leave the Company prematurely, either because they are not asked to transfer or choose not to do so. To minimize this problem, a program of special payments has been established for those employees who remain until their services are no longer needed.

In general, employees who are terminating or retiring will qualify for special payments if they remain on the job as long as needed and are not terminated for cause. Examples are as follows:

*Qualifies*

Employee continues working until time when services are no longer required, and:

1. employee has not been offered a transfer;

2. has been offered a transfer and declined the offer.

*Does Not Qualify*

Employee is not offered or does not accept a transfer, and:

1. terminates or retires prior to time that services are no longer required;

2. is terminated by the Company due to unsatisfactory performance prior to relocation;

3. declines an offer of continued employment with the Company in a roughly equivalent position in the New York area."

7. Defendant's purpose in establishing this policy of severance pay was to keep its New York City work force together in order that the company could continue to operate while the relocation proceeded. Defendant realized that the job market at that time was good and that many employees who would not be asked to transfer or who made up their minds not to transfer would have immediately gone out and sought other employment. (Pl. Ex. 1; Testimony of Buker, Tr. 176.)

8. The memorandum of August 12, 1969 contained no cut-off date with regard to any offer made therein by defendant to non-professional employees. (Tr. 179.)

9. In August 1969 plaintiff was categorized as a non-professional employee. (Tr. 14, 15.) As of August 1969, defendant had not determined which non-professional employees would be asked to relocate; these employees were to be notified of defendant's decision as quickly as manpower requirements were determined. (Pl. Ex. 1; Tr. 179.)

10. In September of 1969, Mr. Frederick W. Spooner, who at that time was

defendant's manager of national sales and plaintiff's immediate superior, informed plaintiff of the contents of the aforesaid memorandum of August 12, 1969 and of defendant's special severance pay policy described therein. Plaintiff then saw the memorandum in September 1969, after Spooner had told him about it. At that time, plaintiff was aware that defendant's purpose for establishing this policy was to retain employees who might otherwise have left the employ of defendant prior to completion of defendant's relocation to Houston. I find there is sufficient evidence of actual communication to plaintiff of any offer made by defendant in its memorandum of August 12, 1969. (Tr. 16, 17, 18, 19, 20, 95, 96, 125, 143, 144.)

11. I find that plaintiff has proved by a fair preponderance of the credible evidence that he was an employee of defendant who was affected by the relocation of defendant's offices to Houston and that defendant's program of special severance payments (Pl. Ex. 1), established for such employees, applied to plaintiff.

12. Defendant advised plaintiff in September 1969 that his position of Senior Representative—National Sales would remain in New York City. (Tr. 16, 96, 116, 165.)

13. In May 1971 defendant advised plaintiff that his position of Senior Representative—National Sales was to be moved to Houston; at that time, defendant offered plaintiff a transfer to Houston in the same position. (Tr. 25, 26, 96, 97, 116, 117.)

14. In June 1971 plaintiff advised defendant that, for family reasons, he declined the offer to transfer to Houston. (Pl. Ex. 2; Tr. 25, 26, 27, 28, 51, 52.)

15. After notifying defendant of his decision not to relocate, plaintiff continued to work for defendant in the same position, introducing his replacement to customers, until plaintiff's position as Senior Representative—National Sales was transferred from New York to Houston on July 15, 1971, when defendant closed the New York office. I find that plaintiff continued to work for defendant until his services were no longer required. (Pl. Exs. 2, 5; Tr. 24, 27, 28, 39, 51, 52.)

16. I find that plaintiff continued, in reliance upon defendant's promise of severance pay made in its memorandum of August 12, 1969, to work for defendant until his services were no longer required. (Pl.Exs. 1, 2, 5.)

17. I find that plaintiff's employment with defendant was not terminated due to unsatisfactory performance. (Tr. 40, 52, 65.)

18. In June 1971, after plaintiff declined defendant's offer to transfer to Houston, defendant offered plaintiff an alternative position as Senior Representative—Industrial Sales in the New York area. This offer was not in writing. (Tr. 28, 29, 98, 99, 184, 187, 190.)

19. In June 1971 plaintiff declined defendant's offer of the alternative position in the New York area. (Tr. 32.)

20. In June and July 1971, after plaintiff had declined defendant's offer of the aforesaid alternative position, plaintiff requested the aforementioned special severance payment from defendant. (Pl. Exs. 2, 5, 6; Tr. 40, 41, 47, 48.)

21. Defendant refused to make the aforementioned special severance payment to plaintiff. (Tr. 41, 53, 198.) Prior to defendant's refusal to make severance payment to plaintiff, his three immediate superiors, Dahlheim, Little and Kroeger, had recommended to defendant that plaintiff be granted severance pay because he could not relocate to Houston. (Pl. Ex. 5.) The reason for defendant's refusal of severance pay, at that time, was that plaintiff's departure from Shell, even though his services were no longer required, was considered a "voluntary resignation." (Pl. Ex. 4.)

22. In plaintiff's position as Senior Representative—National Sales, which he held for approximately the last 15

years as an employee of defendant, he was responsible for sales of defendant's petroleum products to large transportation companies throughout the United States, such as, for example, Hertz and Avis. Plaintiff's sales were limited solely to these national accounts. The products he sold consisted of gasoline, diesel fuel, motor oil, lube oil, anti-freeze, etc. To obtain these orders plaintiff would schedule an appointment and then personally travel to see the customer and negotiate the contracts. He would follow up the negotiations by telephone from his office in New York City. Actual delivery of defendant's products was handled by defendant's sales representatives in the field. All of plaintiff's negotiations were with the decision makers, presidents or chief executives of the customers. Plaintiff spent approximately 30–40% of his time traveling by plane throughout the United States to see his customers. When not traveling, plaintiff spent his time in the New York office maintaining his accounts and continuing his contract negotiations with his customers by phone, planning prices with defendant's management, helping to formulate advertising programs, and working with other products managers regarding other products defendant was then selling. In this position as Senior Representative—National Sales, plaintiff became well known to the entire trucking industry as defendant's representative. (Tr. 5, 6, 7, 8, 11, 33, 34, 57, 62, 63, 64, 103, 104, 110, 130, 131.)

23. In the aforementioned alternative position of Senior Representative—Industrial Sales which defendant offered to plaintiff, he would have been responsible for the sale of the same petroleum products to all types of local commercial customers in a limited geographic area, Long Island, New York. In this alternative position, plaintiff would have traveled by company automobile to call on local plants and terminals. In this position, plaintiff would have negotiated his sales with terminal superintendents. Plaintiff would have been dealing with smaller companies and smaller accounts than in his position as Senior Representative—National Sales. In either position he would have negotiated sales in the field and from his office. (Tr. 34, 58, 100, 101, 102, 103, 104, 105, 112, 114, 142, 143, 185, 188, 193.)

24. Plaintiff would have had the same retirement benefits in the alternative position as Senior Representative—Industrial Sales as in his position as Senior Representative—National Sales. (Tr. 101.)

25. The Shell Provident Plan was a savings plan in effect for all defendant's employees in which the employees contributed a certain percentage of their salaries and defendant contributed a certain portion. In the alternative position as Senior Representative—Industrial Sales, plaintiff would have had the same rights and privileges in the Shell Provident Fund as he had in his position as Senior Representative—National Sales. (Tr. 102.)

26. Plaintiff's salary at the time he terminated his employment with defendant as Senior Representative—National Sales was $1,850 per month. In the alternative position as Senior Representative—Industrial Sales he was offered the same salary by defendant. Neither position was on a commission basis. (Tr. 46, 47, 101, 113, 114.)

27. However, plaintiff's salary grade classification as Senior Representative—National Sales was 9–10; the salary grade classification of the alternative position which he was offered was 8–9, although the salary grade classification of industrial representatives ranged from 7 to 8 to 9 to 10. The salary grade classification was determined by defendant's personnel and salary administration people and was based upon job classification, job responsibilities, seniority and performance. Each grade classification established a minimum and a maximum salary which defendant could pay an employee within that grade classification. The difference in ranges between salary grades as, for example,

between grade 7 and 8, was approximately $2,000. (Tr. 35, 36, 37, 105, 106, 107, 196.)

28. I find that plaintiff's chances for advancement within the defendant-company would be less in the alternative position as Senior Representative—Industrial Sales than they would have been if plaintiff had remained with defendant in his position as Senior Representative—National Sales. (Testimony of Little, Tr. 186.)

29. In 1971 plaintiff was one of five national sales representatives in defendant's Marketing organization, all of whom worked out of defendant's New York City offices. Plaintiff was one of two national sales representatives who served only one industry. At that time there were approximately one hundred industrial sales representatives in defendant's Marketing organization, each such representative working in one of the eleven districts into which defendant had divided the United States. There were one, two or three industrial sales representatives in each state. (Pl. Ex. 3; Tr. 34, 45, 46, 47, 61, 87, 114, 166.)

30. I find that the alternative position as Senior Representative—Industrial Sales which defendant offered to plaintiff amounted to a reduction in rank from his position as Senior Representative—National Sales.

31. In defendant's memorandum of August 12, 1969 (Pl. Ex. 1) the phrase "roughly equivalent position" was co-authored by defendant's Personnel Manager, Moore, and defendant's Manager of Policy and Benefits, Buker. The meaning ascribed to that phrase by the authors was "an endeavor that by experience, by background, by education, that this person would be adapted to." The authors did not intend the term "roughly" to equate a geologist with an accountant. According to the authors, if an alternative position necessitated a cut in salary, this "would not have been a roughly equivalent job." According to Buker, this imprecise term was difficult to define and, for that reason, the authors of this phrase would "look at each individual case that came up and determine if this were roughly equivalent to the individual's situation." Buker never passed on plaintiff's request for severance pay. (Tr. 177, 178, 180, 181, 182.)

32. The position as Senior Representative—Industrial Sales which defendant offered to plaintiff in June 1971 was not roughly equivalent to the position which plaintiff then held as Senior Representative—National Sales.

33. I find that plaintiff was not disqualified from receiving severance pay by his refusal to accept the offer of a position as Senior Representative—Industrial Sales in the New York area.

34. I find that plaintiff fulfilled all of the conditions in order to qualify for the aforementioned special severance payments and that thereby defendant became contractually bound by its promise to make special severance payments to plaintiff. Defendant's refusal to pay severance, upon demand, therefore was a clear-cut breach of this contract.

35. The amount of severance pay to which plaintiff was entitled on July 15, 1971 was $19,461.68. (Stipulation of counsel, Tr. 84.)

36. Plaintiff has sustained damages of $19,461.68.

37. By the terms of the contract, qualified employees were to receive their special severance payments in a lump sum upon termination. (Pl. Ex. 1; Tr. 41.)

38. Plaintiff is entitled to interest at the rate of 6% per annum on $19,461.68 from July 15, 1971 to the date of entry of judgment.

## DISCUSSION

In a diversity case the federal court must follow the choice of law rules prevailing in the state in which it sits. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

The question of whether a binding contract came into existence and the

matters of performance and breach are to be determined by the law of the place of performance or, in the alternative, by the law of the state having the most significant contacts with the matter in dispute. Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954).

■ The contract between plaintiff and defendant Shell (Finding of Fact 34; Pl. Ex. 1), by its terms, was to be performed in New York and all significant contacts are with New York. Therefore, New York law is determinative of the issues in this action.

By the terms of its memorandum of August 12, 1969 (Pl. Ex. 1), defendant Shell promised, generally, to make special severance payments to those of its employees in its New York offices who, because of the relocation to Houston, were terminating their employment with Shell on the conditions, however, that they remain on the job as long as needed, were not terminated for cause and did not decline an offer of a roughly equivalent position with Shell in the New York area (Finding of Fact 6).

## OFFER, ACCEPTANCE AND CONSIDERATION

Defendant Shell argues that plaintiff cannot bind defendant by any offer made in the memorandum of August 12, 1969 because the contents therein were never communicated to plaintiff and that, conceding communication, none of the terms and conditions therein applied to plaintiff because at that time plaintiff had been told that his position was to remain in New York. Shell further argues that, even conceding the terms and conditions were communicated and did apply to plaintiff, he was otherwise not qualified for severance pay because he declined Shell's offer of a roughly equivalent position in the New York area, a condition precedent to the arising of a binding obligation of defendant to pay severance.

Plaintiff contends that the document constitutes an offer by Shell to plaintiff which he accepted by continuing to work until his services were no longer needed, thereby giving rise to an enforceable obligation on the part of Shell to pay severance to plaintiff.

■ The prerequisites of a legally binding agreement arise when one party, the offeror, makes an offer and the party to whom the offer is made, the offeree, accepts. Antonucci v. Stevens Dodge, 73 Misc.2d 173, 340 N.Y.S.2d 979 (1973). An offer and acceptance thereof are essential to a contract. Barber-Greene Co. v. M. F. Dollard, Jr., Inc., 239 App.Div. 655, 269 N.Y.S. 211 (1934), aff'd, 267 N.Y. 545, 196 N.E. 571 (1935); Citizens National Bank & Trust Co. of Fulton v. First Trust & Deposit Co. of Syracuse, 245 App.Div. 240, 281 N.Y.S. 138 (1935).

■ A unilateral contract consists of an offer or promise to do something in exchange for an act. The acceptance of such offer or promise is effected by the performance of the act in accordance with the offer. Huntington Pennysaver, Inc. v. Tire Supply Corp. of Long Island, 59 Misc.2d 268, 298 N.Y.S.2d 824 (1969); Antonucci v. Stevens Dodge, *supra*.

■ A contract, to be enforceable, must be supported by valid consideration. I. & I. Holding Corp. v. Gainsburg, 276 N.Y. 427, 12 N.E.2d 532 (1938); Dennis Realty Corp. v. Twersky, 190 Misc. 936, 76 N.Y.S.2d 798 (1947). The consideration must be given with the knowledge of the existence of the offer. Restatement, Contracts §§ 23, 53.

■ In unilateral contracts the consideration is the performance of the specified act or acts. The performance of the act is both the acceptance of the offer and the consideration to support the offeror's promise. Keuka College v. Ray, 167 N.Y. 96, 60 N.E. 325 (1901); Barnes v. Perine, 12 N.Y. 18 (1854); Restatement, Contracts §§ 52, 75.

■ The promulgation of defendant's memorandum of August 12, 1969 constituted an offer as a matter of law. In

Roberts v. Mays Mills, 184 N.C. 406, 114 S.E. 530 (1922), 28 A.L.R. 338, 342 (1924), the Court said: "The posting of the notice and offer of a bonus \* \* \* was a proposal on the part of the mill \* \* \* an offer to the employees then in the mill that, if they would remain until the end of the year, they would have the 10 per cent. bonus." 114 S.E. at 532. A provision in a "supervisory and office personnel policy" that upon permanent termination of employment an employee would be paid separation pay was held to be an offer in Cain v. Allen Electric & Equipment Co., 346 Mich. 568, 78 N.W.2d 296 (1956). The court said in *Cain*: "An offer was made \* \* \*. In short, the adoption of the described policies by the company constituted an offer of a contract." That court held the offer was accepted by plaintiff-employee continuing in employment beyond the period specified. 78 N.W.2d at 301, 302. See Hinkeldy v. Cities Service Oil Co., 470 S.W.2d 494 (Mo.1971).

There is sufficient evidence of actual communication of defendant's offer to plaintiff in the testimony of Spooner, one of Shell's head office managers to whom the memorandum was addressed and who also was plaintiff Ingrassia's immediate superior at that time (Finding of Fact 10). Similarly, there is no lack of evidence of plaintiff's acceptance of the offer by his continuing to work for Shell, with knowledge of the offer, until his services were no longer needed. Keuka College v. Ray, *supra*. This continued service by plaintiff also supplied the requisite consideration to support defendant's promise of severance pay. "The courts have found sufficient consideration for such an agreement in the continuance in service by an employee not otherwise bound to remain, and in the submission of a voluntary resignation." 53 Am.Jur.2d, Master and Servant § 82 (footnotes omitted), citing Hirsch v. Associated Amusement Machine Operators, 205 Misc. 105, 127 N. Y.S.2d 82 (1953). In *Hirsch*, the court held that where the employer promised to pay the employee severance pay upon the employee submitting his written resignation, the submission of the written resignation was sufficient for the promise to pay severance. See Bayne v. Proctor & Gamble Distributing Co., 87 Pa.Super. 195 (1925).

The offer contained in Shell's memorandum of August 12, 1969 applied to plaintiff because he was employed in Shell's MTM organization at the time. The first sentence on page one of the memorandum specifies the MTM organization as one of those to be relocated:

> "A general announcement to all employees will be made on Thursday, August 14, concerning the relocation from New York to Houston of the offices of the MTM organizations, Manufacturing, Transportation and Supplies, and Marketing \* \* \*."

The fact that plaintiff was told at the time the offer was made that his job was to remain in New York does not determine the question of whether or not the offer applied to him. "Where an offer specifies the time of its duration, it must of course be accepted within the time limit; where, however, no time is specified for the offer's duration, it is the general rule that it must be accepted in a reasonable time." 9 N.Y.Jur., Contracts, § 30; Brunner-Booth Fotochrome v. Kaufman, 18 A.D.2d 160, 164, 238 N. Y.S.2d 26, aff'd, 13 N.Y.2d 1077, 246 N. Y.S.2d 403, 196 N.E.2d 60 (1963); 22 West Main Street v. Boguszewski, 34 A. D.2d 358, 311 N.Y.S.2d 565 (1970). In *22 West Main Street*, defendant executed an offer to purchase real property and stated a date for closing. Plaintiff accepted four days after said date. The court held that, absent a specific time of duration, the circumstances surrounding the offer raised an implied limitation of the period within which the offer could be accepted, namely, the closing date. The offer of defendant Shell specified no time for the offer's duration (Finding of Fact 8). However, the circumstances surrounding the offer imply that a reasonable duration for the offer would be the date when the last of those

employment positions referred to in the memorandum was actually transferred to Houston. Furthermore, it is obvious from the language of the memorandum that defendant at the time of the offer had not yet decided which non-professional positions were to be relocated: "\* \* \* as quickly as manpower requirements are determined, employees will be notified of the Company's decision." There is no reasonable basis for defendant's attempt to arbitrarily exclude plaintiff from the application of this offer merely because his was one of the last positions which defendant decided to transfer.

## ROUGHLY EQUIVALENT POSITION

■ There remains only the question of whether plaintiff was disqualified from receiving severance pay because an alternative position of Senior Representative—Industrial Sales which he declined was roughly equivalent to his position as Senior Representative—National Sales.

Plaintiff does not dispute that defendant offered an alternative position as an Industrial Sales Representative in Long Island, New York, and plaintiff has conceded that if the alternative position offered was a roughly equivalent position to the one he had then he is disqualified from receiving severance pay under the terms of the contract. (Tr. 31.)

Whether the two employment positions were roughly equivalent depends upon the meaning which the court ascribes to the phrase "roughly equivalent position."

The rules applicable to the construction of the language of a contract are as follows:

(1) The court should seek a sensible meaning of the words employed and adopt a construction which accords with common sense. Heller v. Pope, 250 N.Y. 132, 135, 164 N.E. 881 (1928); Atwater & Co. v. Panama R. R. Co., 246 N.Y. 519, 524, 159 N.E. 418 (1927).

(2) Words are to be understood in their plain and normal meaning. First National Bank v. National Surety Co., 228 N.Y. 469, 127 N.E. 479 (1920); Simpson on Contracts, § 67, West Publishing Co (1954).

(3) However, great weight and consideration should be given to a practical construction of the contract by the parties. Hart v. Hellman Co., 17 A.D.2d 438, 444, 235 N.Y.S.2d 23 (1962), aff'd mem., 13 N.Y.2d 633, 240 N.Y.S.2d 612, 191 N.E.2d 96 (1963); Hutchins v. Bethel Methodist Home, 370 F.Supp. 954 (S.D.N.Y.1974).

Defendant Shell argues that a practical construction of the phrase "roughly equivalent" requires a consideration of these words as they appear in common usage dictionaries. Webster's Third New International Dictionary of the English Language, Unabridged, 1973, G. & C. Merriam Co., Springfield, Mass. defines the words "roughly" and "equivalent" as follows:

"*roughly*—rough.ly adv (ME rohly, fr. roh, rough, rough+ly): in a rough manner: as a: with harshness or violence: SEVERLY (women were treated—Theodor Reik) (closed the door—Marcia Davenport) b: without finish: COARSELY (local gray stone, —dressed—Amer. Guide Series: Minn.) c: without completeness or exactness: APPROXIMATELY (-speaking) (in chronological order) (must know—what each act will contain—John Van Druten)." *Id*. at 1978.

"*equivalent*—equiv-a-lent/-nt/ adj [ME, fr. MF or LL; MF, fr. LL aequivalent-, aequivalens, pres. part. of aequivalere to have equal power, be equivalent, fr. L aequi- equi + valere to be strong, be worth—more at WEILD] 1: equal in force or amount (the misery of such a position is—to its happiness) (a new TV series film that has the—footage of 13 feature pictures); specif, of a quantity: equal in area or volume but not admitting of superposition (a square—to a triangle) 2a: like in signification or import (-but differently worded state-

ments of the two writers): SYNON-YMOUS (substituted a term—with it but more familiar) b. logic: having equivalence: implying each other." *Id.* at 769.

The Random House Dictionary of the English Language, Unabridged Edition, 1967, defines the words "rough" and "equivalent" as follows:

"rough (ruf), *adj.* \* \* \* 19. not elaborated, perfected, or corrected; un-polished, as language, verse, style, etc.: *a rough draft.* 20. made or done without any attempt at exactness, completeness; or thoroughness; approximate or tentative: *a rough guess.* \* \* \* 29. In a rough manner; roughly." *Id.* at 1247.

"equivalent, *adj.* 1. equal in value, measure, force, effect, significance, etc.: *His silence is equivalent to an admission of guilt.* 2. Corresponding in position, function, etc.: *In some ways their prime minister is equivalent to our president.*" *Id.*

The New Pocket Roget's Thesaurus in Dictionary Form, 1961, Washington Square Press, Inc., gives the following synonyms for the words "roughly", "approximate" and "equivalent":

"*Adv. roughly,* etc. (see *Adjectives*); harshly, cruelly, severely, incompletely, approximately, generally." *Id.* at 359.

"*approximate, adj.* near, close, rough (SIMILARITY)." *Id.* at 24.

"*equivalent, adj.* equal, comparable, even (EQUALITY)." *Id.* at 139.

Taking into consideration the common usages of these words, their meanings as intended by defendant's employees who authored the phrase (Finding of Fact 31) and the aforementioned rules of construction, this court construes the word "roughly" to be synonymous with "approximately," "about," "substantially," "in the main," "essentially," "nearly;" and the phrase "roughly equivalent," as it has been used by the defendant to characterize a position of employment, to be synonymous with the following words and phrases: "approximately the

same," "similar," "not significantly different," "not substantially different," "substantially equivalent," "essentially equivalent," "substantially similar," "substantially the same." See Words and Phrases, Permanent Edition, West Publishing Co., Volumes 3A, 15, 22A, 39, 40 and generally.

With this construction of the phrase "roughly equivalent," we proceed to determine whether the alternative position of Senior Representative—Industrial Sales which was offered to plaintiff in June 1971 was roughly equivalent to the position of Senior Representative—National Sales which plaintiff then held.

There are no New York cases in point on contracts to pay severance upon termination of employment in which the employer's promise does not become binding if the employee refuses an offer of an alternative position. Under such circumstances, a federal court sitting in diversity must attempt to predict what position the state appeals court would take in such a case, the federal court exercising as much freedom of judgment as the state appellate judges. Polk County, Georgia v. Lincoln National Life Ins. Co., 5 Cir., 262 F.2d 486 (1959).

As a guide to predicting the position the New York state courts would take in this case, there is, fortunately, a substantial body of case law concerning the closely analogous actions for breach of employment contract and the related wrongful discharge actions. In these analogous actions the New York courts have uniformly agreed in the criteria applied for comparing positions of employment. In the breach of employment contract action the comparison is made between the position promised and the position which the employee is asked to accept, either at the outset of his employment or at a future date when the employer requires him to take some other position with the employer. In the related wrongful discharge actions, the comparison is between the position from which the employee was discharged and the alternative position which a wrong-

fully discharged employee is required to seek in order to fulfill his duty to mitigate damages. This latter class of actions often involves circumstances wherein the wrongfully discharged employee has refused an offer of an alternative position with the same employer and the employer interposes this refusal to establish a failure by the employee to mitigate damages. In all of these cases the courts have been asked to compare one position of employment with an alternative or "other" position of employment.

Concerning actions for breach of employment contract, New York courts hold that any material change in job duties may constitute a breach. Rudman v. Cowles Communications, 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972); Karas v. H. R. Laboratories, 271 App.Div. 530, 67 N.Y.S.2d 15, aff'd, 297 N.Y. 494, 74 N.E.2d 192 (1946); Marks v. Cowden, 226 N.Y. 138, 123 N.E. 139 (1919).

The general rule in wrongful discharge actions is that the employee is obliged to mitigate damages by seeking and accepting other available employment of the same or substantially similar character but not employment of a substantially different kind. Howard v. Daly, 61 N.Y. 362 (1875); 44 A.L.R.3d 640 (1972). The kind of "other" employment which the employee is under a duty to seek and accept has been variously defined by the New York courts. Thus, in Fuchs v. Koerner, 107 N.Y. 529, 14 N.E. 445 (1887), the court held an employee was not required to enter on a new business or one different from that which he had undertaken. The "other" employment must be "of the same kind" (Milage v. Woodward, 186 N.Y. 252, 78 N.E. 873 (1906)) but not necessarily of exactly the same kind or even at the same salary. DeLoraz v. McDowell, 68 Hun. 170, 22 N.Y.S. 606 (1893), aff'd, 142 N.Y. 664, 37 N.E. 570 (1894). It must be of a similar character (Martin v. Johnston, 6 Misc. 310, 26 N.Y.S. 1105, aff'd, 148 N.Y. 740, 42 N.

E. 724 (1893)) or employment which is suited to the employee's station. Ruland v. Waukesha Water Co., 52 A.D. 280, 65 N.Y.S. 87 (1900). It must be similar or comparable employment. Crabtree v. Elizabeth Arden Sales Corp., Sup., 105 N.Y.S.2d 40 (1951), aff'd without op. 279 App.Div. 992, 112 N.Y.S.2d 494, aff'd, 305 N.Y. 48, 110 N.E.2d 551 (1952); Karas v. H. R. Laboratories, supra. The "other" employment must not be in the same business at a lower salary (Whitmarsh v. Littlefield, 46 Hun. 418 (1887) or where the work is more arduous. Connell v. Averill, 8 A.D. 524, 40 N.Y.S. 855 (1896).

Significantly, the New York courts have used the same descriptive terminology when comparing two employment positions for the purpose of determining breach of contract or failure to mitigate damages as this court must now apply, in accordance with its construction of the phrase "roughly equivalent," to compare two employment positions for the purpose of determining whether there was a failure of a condition precedent to defendant's liability under the contract, that is, whether plaintiff was offered and refused a roughly equivalent position with defendant in the New York area.

New York courts have uniformly held that any reduction in rank or material change in the duties of an employee will form the basis of an action by an employee for breach of his employment contract and that a wrongfully discharged employee may refuse an offer of "other" employment without affecting the liability of the employer for wrongful discharge if the "other" employment amounts to a reduction in rank. Rudman v. Cowles Communications, supra; Karas v. H. R. Laboratories, supra; Marks v. Cowden, supra; Hicks v. Haight, 171 Misc. 151, 11 N.Y.S.2d 912 (1939); 36 N.Y.Jur., Master and Servant, § 55; 53 Am.Jur.2d, Master and Servant, § 44. Thus, in both Rudman v. Cowles Communications, supra, and Marks v. Cowden, supra, the

plaintiffs retained their respective salaries and job titles but were subordinated when their employers placed other employees in supervisory positions over them, and in both cases this was held to be a reduction in rank and breach of contract of employment. In Karas v. H. R. Laboratories, *supra,* the plaintiff had been employed as both the director of research and director of quality control operations; he was held to have suffered an actionable reduction in rank when his employer hired someone else to direct the research operation even though the plaintiff retained his position as director of quality control operations and received a 50 per cent increase in salary. The employee is only required to engage in service of a character and grade equal to that from which he was discharged and nothing inferior in rank and degree. Briscoe v. Litt, 19 Misc. 5, 42 N.Y.S. 908 (1896); Standard Oil Co. v. Lloyd, 26 Ala.App. 306, 159 So. 371 (1935); Schiller v. Keuffel & Esser Co., 21 Wis.2d 545, 124 N.W.2d 646 (1963); American Trading Co. v. Steele, 9 Cir., 274 Fed. 774 (1921). Cf. Crabtree v. Elizabeth Arden Sales Corp., *supra;* Heiferman v. Greenhut Cloak Co., 143 N.Y.S. 411, rev'd on other grounds, 83 Misc. 435, 145 N.Y.S. 142, rev'd and original order reinstated, 163 A.D. 939, 148 N.Y.S. 1119 (1913); Teich v. Aetna Industrial Corp., 8 A.D. 2d 596, 184 N.Y.S. 556 (1959), reversing, 11 Misc.2d 530, 174 N.Y.S.2d 743, aff'd, 8 N.Y.2d 766, 201 N.Y.S.2d 780, 168 N.E.2d 114 (1960).

The alternative position which defendant Shell offered to plaintiff clearly represented a "reduction in rank." In this alternative position as Senior Representative—Industrial Sales plaintiff's salary grade classification would have been lower (Finding of Fact 27); he would have been one of one hundred district representatives servicing a small geographic location rather than one of five national representatives servicing an entire industry (Findings of Fact 23 and 29); he would have been selling to terminal superintendents of small local companies rather than to chief executives of large national corporations (Findings of Fact 22 and 23); his accounts would have been smaller (Finding of Fact 23). Although his salary would have been the same, initially, his chances for advancement would have been less (Findings of Fact 26 and 28).

I conclude that the New York courts would take the position that the alternative employment position of Senior Representative—Industrial Sales was inferior in rank and, therefore, and otherwise, not roughly equivalent to the position of Senior Representative—National Sales.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the persons and subject matter of this action. 28 U.S.C. § 1332.

2. New York law governs the rights of the parties to this action.

3. Plaintiff has proved by a fair preponderance of the credible evidence that defendant, by its memorandum of August 12, 1969, made an offer of severance pay, that this offer was communicated to plaintiff and that plaintiff accepted the offer by continuing, in reliance thereon, to work for defendant until his services were no longer required.

4. Plaintiff's continuing to work until his services were no longer required by defendant, in reliance upon defendant's promise of severance pay, was sufficient consideration to support defendant's said promise.

5. Defendant did not offer plaintiff a ".roughly equivalent" position in the New York area.

6. Plaintiff was not disqualified from receiving severance pay by his refusal to accept the offer of a position as Senior Representative—Industrial Sales in Long Island, New York.

7. Defendant's refusal to make aforesaid severance payments to plaintiff, upon demand, was a breach of contract by defendant.

888

8. Plaintiff is entitled to judgment against defendant in the agreed sum of $19,461.68 with interest thereon from July 15, 1971, at the rate of 6% per annum, with costs.

Settle judgment promptly on notice pursuant hereto.