**In re KDI CORPORATION, Debtor.**

**KDI CORPORATION, Debtor/Plaintiff,**

v.

**Ross M. GWYNN, Claimant/Defendant
and Third-Party Plaintiff,**

v.

**Tim THEMY, Third-Party Defendant.**

**Bankruptcy No. 61463.**

United States Bankruptcy Court,
S. D. Ohio, W. D.

July 16, 1982.

**654**

Robert O. Edington, Jeffrey P. Harris, Hartsock, Harris & Schneider, Cincinnati, Ohio, for debtor.

Peter J. Strauss, Stephen L. Black, Graydon, Head & Ritchey, Cincinnati, Ohio, for Gwynn.

## DECISION

BURTON PERLMAN, Bankruptcy Judge.

KDI Corporation, debtor herein, filed for relief under Chapter XI of the United States Bankruptcy Act in December 1970. KDI's Plan of Arrangement was thereafter confirmed in June 1973. On April 19, 1971, Ross M. Gwynn, claimant herein, filed a proof of claim for $30,878.66 which was assigned Claim No. 178. KDI filed an objection to that claim on June 25, 1971 stating that it was not truly or justly indebted to Gwynn for the amount he claimed. On July 23, 1973, a second proof of claim was filed on behalf of Gwynn by Howard Thompson, a patent attorney, pursuant to a power of attorney given him by Gwynn. It was assigned Claim No. 765. This proof of claim prayed for damages in an unspecified amount. The bankruptcy court made a determination supporting Gwynn's claim on a consulting agreement, but as to the Reorganization Agreement directed that Gwynn liquidate his claim through litigation "in a proper forum" within one year. In an Opinion entered May 4, 1977 (which dealt primarily with an appeal from a Decision of Bankruptcy Judge Pellman regarding claims of Tim Themy (or breach of the Reorganization Agreement) Judge Porter reversed the action of the Bankruptcy Judge. In that Opinion he made reference to Claim No. 765 but did not take any substantive action with regard to it. He did (p. 24) hold that KDI was liable on the "employment contracts," it being clear that this included Gwynn's consulting agreement (p. 28). There Judge Porter said that KDI

should on a rehearing be permitted to offer evidence with respect to mitigation.

Thereafter, KDI moved to dismiss proof of Claim No. 765 on grounds that it was not timely filed. We overruled that motion holding that Claim No. 765 must be regarded as an amendment of timely filed Claim No. 178. Debtor thereafter filed a counterclaim against the claim of Gwynn, which counterclaim was subsequently amended, alleging violations of the securities laws of the United States by Gwynn in the transaction between Chloroguard and KDI, both under Federal and California law. The counterclaim also included a count for rescission on account of fraud and deceit. Gwynn moved to dismiss the counterclaim. We denied the motion by Order entered October 27, 1978. Gwynn thereafter filed a third party complaint, essentially for indemnity, against Tim Themy.

KDI subsequently filed a motion for partial dismissal of Claim No. 765, insofar as it related to breach of the consulting agreement, it being the position of KDI that the maximum amount of damages regarding the consulting agreement was fixed at $30,878.66 as set forth in the original Gwynn proof of Claim No. 178. We denied that motion by Order entered November 4, 1980.

On November 23, 1981 KDI moved to disqualify counsel for Gwynn. After hearing, we overruled such motion by Order entered November 27, 1981. Trial of the issues presented by Gwynn's claims and the counterclaim then ensued. We turn now to those issues.

At the beginning of our consideration we make reference to a device which is central to the present claim. The device is an electrolytic cell for the production of chlorine which may be referred to as a chlorinating cell. Within the cell a basic electrolytic process is carried on wherein free chlorine is produced by electrically decomposing a chloride salt in solution in water. Claimant and Tim Themy filed several patent applications upon which patents issued for improved structures and a method for carrying out this process. Such device provides an alternative to the conventional

way that chlorine is introduced into, for example, swimming pool water. The conventional way is to dissolve chlorine containing chemicals in water. Upon solution the chemicals release chlorine into the water.

The story here begins in 1952 when Themy was working as a dealer selling chlorinating cells for another. By 1959 he had begun his own business making units comparable to those he had been selling as a dealer. He and Gwynn met in 1963 in San Francisco. They went into business together in Sacramento, California. What they were involved with was the development of an improved chlorinating cell. According to Gwynn, their work resulted in improved anode structures for use in their cells and also for method, upon which inventions patents were obtained. They made and sold their cells in the western states, California and Colorado particularly. Their operation was not particularly profitable. Gwynn and Themy made their living from it, but did not draw down extravagant amounts of compensation. A large number of warranty claims made by purchasers of their cells were indicative of problems that accompanied the product.

Themy and Gwynn were partners in the enterprise at first, using their own capital for the development of the company. In 1966 investors Setzer and Dodie entered the picture. The enterprise was incorporated under the name Chloro-Guard Electronics Inc. (hereafter "CG".) Though he got somewhat less at first, Gwynn ultimately owned 40% of the stock in CG. Setzer put $220,000.00 into the business.

Sometime before January 1969, Gwynn initiated a contact with KDI. He testified that he had read an article in a national magazine about KDI and Cox, its then president. At this time KDI was an acquisition minded conglomerate with a major interest in swimming pools. Means for purifying swimming pool water by an electrical device for producing chlorine rather than by the conventional chemical method, was of interest to KDI.

Gwynn contacted KDI and on January 20, 1969 he and Themy came to Cincinnati where they met with Cox and Lyons of KDI on the subject of merger. These talks were serious, for they continued for several days, and Scalora, attorney for CG, came to Cincinnati from California to participate in them. An agreement was not, however, concluded at this time. On January 26, 1969, Gwynn and Themy went to Athens, where Themy proceeded to introduce Gwynn to people. This was Gwynn's first exposure to Europe. Gwynn spent most of the rest of 1969 there. He returned to the U.S. at the beginning of March 1969. At this time, CG had discussions with another prospective merger candidate, Crescent General, but this transaction was scrapped on the advice of counsel. Gwynn then returned to Europe April 24, 1969, not returning until August, 1969.

An agreement was entered into between CG and KDI which was ratified by Gwynn on October 1, 1969. By this agreement, CG was merged into a new entity wholly owned by KDI known as KDI Chloro-Guard (hereafter "KDI-CG".) CG stockholders surrendered their stock in CG and that corporation was dissolved. Gwynn became, not an employee of KDI-CG but, pursuant to written agreement, a consultant to it.

The transaction between CG and KDI was formalized in a document entitled Reorganization Agreement dated September 26, 1969. An important fact is that prior to the time of the Reorganization Agreement, KDI acquired one of the CG cells and shipped it to the University of Colorado for testing prior to the merger. The record contains no report of the test results. We infer, however, from the fact that KDI proceeded with the acquisition that the results were positive.

KDI-CG acquired all of the assets and assumed most of the liabilities of CG in exchange for certain consideration flowing to the CG stockholders. Those stockholders received an initial payment, and were to receive in the future an interim "earnout" which would be based on the profits of the business, and a final earnout computed by

multiplying net after-tax earnings of KDI–CG by 12. The agreement also provided for another payment in the event that the total contingent earnout exceeded $4,000,000.00. The relevant earnout provision is set out at p. 5, section 1(B)(2) of the Reorganization Agreement. All of the foregoing payments were to be in KDI stock.

Pursuant to the Reorganization Agreement, the initial payment of $400,000.00 in KDI stock to be paid to the CG stockholders was to be placed in escrow. Further, the Reorganization Agreement provided that the patents owned by Gwynn and Themy were assigned to CG, which reassigned them to KDI–CG. (Such patents have subsequently been assigned to Howard Thompson, Esq., Trustee, and nonexclusive royalty free licenses have been granted to Themy and Gwynn thereunder.)

In the consulting agreement between KDI–CG and Gwynn, Gwynn agreed to be available for, and to perform consulting services for, KDI–CG "at the places and times and as the corporation may from time to time request." In return, KDI–CG became obligated to pay Gwynn an amount equal to 1% of aggregate revenues received and accrued by the corporation during the five-year period that the "earnout" was in effect, provided that the annual compensation was to be no less than $20,000 nor more than $35,000.00 per year. This compensation was payable in monthly installments at the minimum annual rate of $20,000.00 per year. The corporation was also obligated to reimburse Gwynn for his reasonable traveling and entertainment expenses. The consulting agreement provided for termination in the event of wrong-doing of Gwynn as consultant, but required that Gwynn be served by the company with notice of such wrong-doing and have the opportunity to cure any such default.

As we have seen, the closing of the acquisition of CG by KDI occurred October 31, 1969. At that time Gwynn was in Europe where he remained through the rest of 1969 and the first three quarters of 1970, except that he was in this country briefly at the end of March, 1970. During this visit he was in Cincinnati and Los Angeles. The record is bare of any requests by anyone at KDI–CG for Gwynn to perform any services. Yet it was the testimony of Gwynn that he sent progress reports to Kaestner at KDI, as well as Spink, in which he informed them of the medical and therapeutic experimental work he was doing on behalf of KDI–CG. Initially Gwynn was reporting to Cox and Kaestner, but later on in 1970, Thompson told him to report only to Kaestner and Thompson regarding his therapeutic experiments.

It is clear from the record that Gwynn was out of the country during the period leading up to and including the shut-down of KDI–CG and could not testify in respect to the events leading up to that shut-down.

We move now to the time when KDI "mothballed" KDI–CG. This was done by Scheidler, general manager of KDI–CG, on September 15, 1970. (Scheidler became general manager of KDI–CG September 1, 1970, his superior at KDI then being Friedrich. Spink had been general manager of KDI–CG prior to Scheidler. Spink left September 1, 1970, Friedrich then having terminated him.) Scheidler decided to mothball KDI–CG thirteen days after he took over, though it was not then decided permanently to shut the operation down. Scheidler testified that the operation could have been started up again. Matthey, then president of KDI decided in October 1970 to make the shut-down permanent. A significant event which occurred during the period between the acquisition and the shut-down was the move of the KDI–CG operation from Sacramento to Cincinnati in about April 1970. The evidence was that during the ten month time of operation of KDI–CG KDI injected some $250,000.00 into KDI–CG, and the product was improved. Fred Pool had been a distributor for CG and continued as such under KDI–CG. He testified that the product was significantly improved during the time of operation under KDI–CG to eliminate cell leakage.

At about the time of the acquisition of CG by KDI, KDI began to experience financial difficulties which culminated in the

Chapter XI filing. During 1970 it became necessary for debtor to contract its operations. The record does not make clear whether this was because of the general economic climate in 1970 or because of improvident financial practices by debtor in overextending its resources in its acquisition program. In any event, there came a time in mid-1970 when the expansion phase of debtor gave way to one of fiscal restraint. In this transition Walter Cox, the president of debtor, who had negotiated the merger with CG was supplanted by Louis Matthey. Even prior to the time that Matthey was named president of the debtor, fiscal matters were brought under his control. That is, expenditures could not be made without his approval. He had theretofore been associated with a business consulting firm which had been retained to deal with the problems which had arisen in the operation of debtor. Matthey was dispatched by that firm to debtor to consider what medicine was necessary to correct the ills of debtor. One of his first actions was to meet with a bank consortium in Chicago for the purpose of securing a line of credit which the bankers had been unwilling to renew. He was successful in this effort.

This was a time of belt tightening at KDI. Upon arrival at KDI Matthey launched an inquiry into the various companies owned by debtor by colleagues brought with him from his consulting firm, for the purpose of determining which could be profit contributors, and which profit drains. As a result of this review, in October, 1970, Matthey reached the decision not to reactivate KDI–CG, it having been shut down, as we have seen, by Scheidler in mid-September. Clearly, the shut-down and decision not to reactivate were related to the financial trauma being experienced by KDI. The picture which emerges, then, is that in the course of dealing with its financial difficulties, KDI in mid-1970 to fall 1970 had to make choices as to where it would commit its funds, a situation with which it had not theretofore been faced. One of its subsidiaries was KDI–CG. The situation of KDI–CG at that time was that it was producing and selling a product whose market

potential was unknown. In the light of this fact, it was simply unknown whether in the end the product would be commercially successful. In order fully to explore this question a further infusion of capital into KDI–CG by KDI would be necessary with no assurance that the market outcome would be positive. In the fall of 1970 KDI was no longer in a position to gamble with this subsidiary and it was therefore terminated.

## The Reorganization Agreement

The present proceeding presents for decision the question of whether debtor breached the Reorganization Agreement. We have concluded that there was a breach. Having reached this conclusion, we must also then deal with the question of damages for the breach.

### 1. Breach of Contract.

The Reorganization Agreement with which we are here concerned, was entered into September 26, 1969 between KDI Corporation and CG as well as with Tim Themy and Ross Gwynn, each of whom owned 40% of the stock of CG.

The nature of the transaction which occurred by reason of the Reorganization Agreement was a sale of the assets of CG. Certain consideration for this transfer was provided in the Agreement. The transaction between CG and KDI was closed October 31, 1969. Upon that date KDI–CG assumed the operation of the business. Less than a year later, on September 15, 1970, KDI–GC was shut down. We are satisfied that the reason that this occurred was because the parent company, debtor herein, found itself in financial difficulties which compelled it to terminate operations which were not then profitable. We conclude that debtor in closing down KDI–CG was not motivated to do so because it had found its products to be commercially hopeless, as contended by debtor.

Claimant says that this termination of operations amounted to a breach of contract. There is no contract provision which expressly provides a period of time during

which KDI–CG was obliged to operate. Such a provision may, however, be implied. Underlying every contract is an implied condition of good faith. As stated at 17 *Am.Jur.*2d 653:

Every contract implies good faith and fair dealing between the parties to it.

Good faith, consistent with the reasonable expectations of the selling parties in the Reorganization Agreement, required that KDI operate KDI–CG until it was established that the product was commercially hopeless. KDI did not comply with this obligation. It shut down the enterprise because of financial exigencies in its own affairs at a time when it was unknown what the ultimate commercial fate of the products of KDI–CG would be. This was a breach of the Reorganization Agreement.

■ Claimant as an alternative basis for liability points to Exhibit I which is a part of the Reorganization Agreement and is entitled "Management During the Formula Period and Related Matters". Exhibit I provides that the acquired business "be managed in a manner consistent with good business practice." Claimant contends that this contract provision was breached. In support of this position claimant sought to prove that there were certain deficiencies in the operation of KDI–CG which were not consistent with good business practice. Specifically, it is the position of claimant that KDI–CG should have modified the product of CG to incorporate a flow cut off switch into the mechanism; that is was not consistent with good business practice to sell the product of the enterprise without testing for leaks; that collection of accounts receivable was not done in a proper manner. Claimant has failed to persuade us in this effort.

The notion of installing a flow cut off switch was known to CG prior to the reorganization and yet, despite the fact that its incorporation into the structure was not formidable, its then management (which continued under KDI–CG) did not do so.

In this connection, we think it especially pertinent to note that the same section of the Reorganization Agreement, Exhibit I thereto, which called for "good business practice" also required that KDI "use its best efforts to preserve the key personnel" of CG. Pursuant to this, Themy continued in the management of KDI–CG after consummation of the sale. By his contract, then, claimant at least acquiesced in management decisions of KDI–CG.

As to quality control, there was evidence in the record, principally by the testimony of Pool, that after the accession of the merged entity KDI–CG, the product did improve. As to collection of accounts receivable, the record before us is far from persuasive that KDI–CG was remiss in pursuing them. Many complaints were made by customers, with warranty claims, and failures to pay, which bore on the collectibility of the accounts receivable of KDI–CG. We hold that claimant has failed to sustain its burden of proof that KDI–CG was not managed in a manner consistent with good business practice.

2. *Damages for breach of Reorganization Agreement.*

■ In his post trial memorandum, claimant asserts that proper damages for breach of the Reorganization Agreement would be an award to claimant of 1,210,847 shares of KDI stock and $493,810.00 on account of patent royalties.

The way in which these figures were derived was via the opinion testimony of two expert witnesses. Claimant had to proceed in this fashion because the shut-down removed any possibility for determining damages on the basis of actual experience. The witnesses called were Schamel and Ettlich. What these experts did was to make an estimate on a year by year basis of the market potential for the sale of units. A percentage representing expected market penetration by KDI–CG based upon the expertise of the witness was then applied. Thus there was derived a volume sales figure for each year. There was then applied to the figures for the number of units sold the information which the expert witness had regarding net after tax dollars per unit. A definition of "net after tax" dollars

which was purported to be found in the Reorganization Agreement was used. Thus a total of $1,214,000.00 was derived. The purpose of deriving this figure was to enable the claimant to make a further computation based upon provisions of the Reorganization Agreement under paragraph 1(B)(2) for Additional Consideration. This computation employed a KDI stock valuation as of August 31, 1974 of .9625 dollars per share to arrive at the aforementioned figure of 1,210,847 shares claimed to be due to Gwynn by reason of his 40% holding of the shares of the CG. With respect to patent royalties, claimant applied the contract royalty rate to sales of units derived in the manner mentioned above.

After serious and careful consideration we have concluded that the bases for damages for breach of the Reorganization Agreement advanced by claimant are unsound. They include a component for profits which might have been made in the field of municipal water purification. It was this about which Ettlich testified. We decline to make any award of damages for such a use of the cells. The evidence was clear that the primary interest of KDI in acquiring CG was in connection with its swimming pool business. Possible profits in the municipal water treatment field are entirely too speculative to provide a basis for damages.

■ Claimant's expert Schamel did testify with regard to the swimming pool field. The Schamel opinion, however, is not valid for purposes of assessing damages, not because of inadequacy of the witness, but rather because of the assumptions upon which he based his opinions. Schamel was asked to determine what in his opinion should have been the capital contribution of KDI to KDI–CG in order that it comply with its contractual obligation of exercising good business practice. He testified that "about $475,000.00" would be required to get the product on the way to a successful commercialization. His testimony regarding profits assumed that a capital infusion in this magnitude had been made into KDI–CG.

We are unwilling to accept an opinion based on this premise. It is inequitable now to impose upon KDI an obligation respecting the amount of capital to be transferred to KDI–CG which could have been contracted for. By failing to contract for any specific amount, claimant agreed in effect that he would submit to the judgment of KDI in this respect, subject to the requirement of good faith. The undisputed fact is that KDI did inject some $250,000 into KDI–CG during the time of its operation. The evidence further is that the product was improved during this period. The evidence established that when Kaestner and Spink were in charge of KDI–CG, that is, until September 1, 1970 there was a positive commitment to the product. There is no evidence that in this respect KDI acted other than in good faith. That is all that claimant had a right to expect under the contract and we cannot award damages based upon ground rules for which the parties did not contract.

Further, the Schamel testimony was based upon the assumption of a failure to meet the contractual obligation that KDI–CG be managed in accordance with "good business practice", an assumption which we have earlier stated was not proved.

■ Thus, we find ourselves in a dilemma. We have found a breach of contract by debtor in this case which should entitle claimant to damages. The measure of damages proposed by claimant, however, is fatally flawed for the reasons mentioned above. There is an obligation upon us to resolve the dilemma, and we do so in the exercise of our equitable power. In this effort the Schamel figures are useful. They may be taken to represent an idealized optimum for the products of KDI–CG. If we make reductions therein on account of the following factors together with the various considerations dealt with earlier in this Decision, we can arrive at an equitable result:

1. Compensatory damages should be based upon a five year period from the date of closing, that is, from October 30, 1969, because the contract provides for certain

consequences during a Formula Period of five years in the Reorganization Agreement.

2. The definition in the Reorganization Agreement of "net after—tax earnings" (see JX 1, # 27, para. 2(b)(vi)) clearly was consistent with the natural import of those words. The Schamel figures employed by claimant in his memorandum should have been reduced, and 55% of those figures should have been taken, consistent with the testimony of Schamel.

3. It was by no means certain that ultimately the CG cell would have been commercially successful. The problem of a deposit on the electrodes in the cell during operation was inherent in the structure. Neither claimant nor anyone else was successful in devising a means which would automatically clear the electrodes of such deposit. Uncleared, the deposit was destructive of the cell. The invention in one of the patents of which claimant was coinventor, of reversing polarity during operation of the cell, did not solve the problem. The only way in which the deposit could reliably be dealt with was by a frequent acid wash of the electrodes. If the user was willing to undertake the frequent maintenance which this required, the cell would be good for an extended period. We are certain, however, that such a requirement for trouble free operation would limit the market for such cells, particularly in the swimming pool field. Many pool users would prefer the relative convenience of simply adding chemicals to the pool rather than undertaking the required cell maintenance, which, incidentally, required the user to handle an extremely corrosive substance, muriatic acid.

\* \* \*

Employing the technique we have stated and applying the mentioned factors and considerations we conclude that an appropriate award of damages on this score is $100,000.00 on account of Additional Consideration and $20,000.00 on account of patent royalties.

*The Consulting Agreement*

In conjunction with the execution of the reorganization agreement, Gwynn and KDI–CG entered into a "Consulting Agreement" on October 31, 1969. (JX 1, # 17) The term of this agreement was to be five years, commencing November 1, 1969. Under the agreement, Gwynn was obligated:

"to be available for and perform, the consulting services specified herein at the places and times and as the Corporation may from time to time request.

\* \* \* \* \* \*

devote such time, attention and energies as shall be reasonably necessary to advise and consult with the employees and representatives of the Corporation regarding the business and products of the Corporation."

The agreement further provided that:

"The Corporation may discharge Consultant and terminate this Agreement for Consultant's dereliction, malfeasance or wrongful acts or for failure, neglect or refusal of Consultant to perform his duties and obligations hereunder; provided, however, that the Corporation shall not terminate this Agreement and discharge Consultant unless and until the Corporation shall first have served upon Consultant a written notice, specifying with particularity Consultant's default hereunder and Consultant shall have failed, neglected or refused to correct or cure the stated default within ten (10) days after receipt of said notice."

In exchange for Gwynn's services, KDI–CG agreed to pay him a minimum annual salary of $20,000, payable in monthly installments. In addition to this base salary, Gwynn was entitled to receive as compensation 1% of aggregate revenues of KDI–CG during the five year term. The maximum annual salary, however, was set at $35,000. KDI–CG also agreed to reimburse Gwynn for his reasonable traveling and entertainment expenses.

Gwynn left the United States for Greece in October of 1969. It is undisputed that, while in Greece, Gwynn engaged extensive-

ly in medical research and application of the effluent produced by the chlorine generator. Among such activities, Gwynn administered injections of chlorozone to several people for treatment of various ailments such as multiple sclerosis, exzema and the common cold. (PX 167; Testimony of Gwynn) The nature and extent of Gwynn's paramedical use of chlorozone is well-documented in a publication by Gwynn, entitled "Bioelectrolysis In Man". (PX 23) Officials of KDI–CG were aware of Gwynn's paramedical activities. There was no evidence that prior to September of 1970, any official of KDI–CG considered Gwynn's paramedical activities to be in violation of the consulting agreement.

In a letter dated November 12, 1970, (JX 5) Matthey wrote to Gwynn the following:

"We have recently become aware of various of your activities in Greece which involve a paramedical use of a portion of the effluent emanating from the Chloro Guard unit. We have had no prior notice of such actions and consider same to be grossly improper and wrongful on your part as a consultant of KDI Chloro Guard Corporation.

Accordingly, this is to advise you that you are terminated, effective immediately, as a consultant of KDI Chloro Guard Corporation".

The last payment that Gwynn received under the consulting agreement was for the month of September, 1970.

1. *Liability for breach of Consulting Agreement.*

■ The question of whether KDI is liable for breach of Gwynn's consulting agreement is answered in large part by Judge Porter's opinion in *KDI v. Themy* and *KDI v. Gwynn*, Civil No. C–1–77–115 (S.D.Ohio 1977) (unreported). That decision was rendered in the consolidated appeals by KDI of Bankruptcy Judge Pellman's decision allowing Themy claim No. 425 and Gwynn claim No. 178. In that opinion Judge Porter found KDI to have wrongfully terminated Gwynn's consulting agreement on the ground that KDI did not comply with the ten day notice provision set forth in the agreement. *Id.* at pp. 22, 24, 28. Under the doctrine of law of the case, we are bound by Judge Porter's decision, *see generally*, 1B Moore's Federal Practice, ¶ 0.404[10], at pp. 571–77 (2d ed. 1982). In addition we will comment further in view of the evidence here presented to us.

■ KDI does not dispute Gwynn's claim that it failed to give the ten day notice for termination required by the consulting agreement. Matthey's letter to Gwynn simply informed Gwynn that his termination as a consultant was to have immediate effect. (JX 5.) In its memorandum of law, however, KDI appears to argue that Gwynn's paramedical use of chlorozone gave rise to an emergency situation which entitled KDI to forego its obligation under the notice provision of the agreement. According to KDI, Gwynn's conduct was so intolerable that it was necessary immediately to sever their relationship in order to avoid any potential liability that might arise from Gwynn's activities. This argument is not persuasive.

As we have noted earlier, certain individuals of the KDI management were fully aware of Gwynn's actions in the field of medical experimentation with chlorozone. Prior to Matthey's letter, however, Gwynn had never been given any indication that his conduct might be considered a violation of the consulting agreement. If KDI had complied with the notice requirement, Gwynn would have had an opportunity to cure what KDI considered to be a default under the agreement. Failure on Gwynn's part to cease performing the objectionable activities within the appropriate time period may have then justified his dismissal. Therefore, even if Gwynn's conduct amounted to "malfeasance or wrongful acts" under the language of the consulting agreement, thereby giving rise to KDI's right to discharge Gwynn, nevertheless he could not be summarily dismissed. KDI was bound to exercise its right of termination within the constraints set forth in the agreement with respect to which KDI freely contracted. The notice provision was a

condition precedent to KDI's exercise of the right to discharge Gwynn. The agreement simply did not provide for exceptions to the notice procedure, and we are unable to locate any authority to support KDI's claim that extraordinary circumstances may obviate the need to comply with an established termination procedure. Moreover, the consulting agreement contains no definition of cause and we are not persuaded that the acts performed by Gwynn gave KDI–CG a basis for termination for cause.

## 2. Damages for breach of the Consulting Agreement.

While Judge Porter made a determination of the question of liability for breach of the consulting agreement, he directed to the bankruptcy court the issue of the amount of damages to be awarded to Gwynn, stating that, "KDI should be permitted to offer evidence with respect to mitigation, as well as evidence bearing on the validity of expenses and royalties claimed." *KDI v. Themy*, supra, at p. 28. After due consideration, we hold that the circumstances of this case do not warrant the application of the doctrine of mitigation of damages.

The general rule of damages for breach of contract for personal services, when the contract has a definite term of duration, is the amount of compensation agreed upon for the remainder of the term, less the amount which the servant might have earned, or actually earned, through the exercise of reasonable diligence. *Parker v. Twentieth Century-Fox Film Corp.*, 3 Cal.3d 176, 181, 89 Cal.Rptr. 737, 740, 474 P.2d 689, 692 (1970); *KDI v. Themy, supra,* at p. 25. If, however, the discharged employee could have performed the subsequent work as well as that which his former employer had required of him, then his subsequent earnings need not be applied in reduction of the damages sought. *Wise v. Southern Pacific Co.*, 1 Cal.3d 600, 607, 83 Cal.Rptr. 202, 207, 463 P.2d 426, 431 (1970). *See also* 22 Am.Jur.2d, *Damages*, § 71, at p. 107.

The evidence adduced on this point is clear. Subsequent to the termination of the consulting agreement, Gwynn obtained employment with Trans World Airlines (TWA). His gross wages for the years 1972, 1973 and 1974 were $856.12, $12,843.63 and $16,406.03, respectively. (DX 24) KDI contends that the damages sought by Gwynn for the breach should be reduced by these amounts.

Gwynn testified that his employment at TWA did not render him unable to perform consulting services which KDI might request. This testimony was not refuted. KDI urges, however, that because the consulting agreement required Gwynn "to be available for and perform ... the consulting services specified herein at the places and times and as the Corporation may from time to time request", Gwynn could have been required to perform services to such a great extent that he would not have been able to perform two jobs. This proposition is not valid in light of the realities of this case. Gwynn had performed consulting services for KDI–CG such as monitoring the installation of a drinking water facility on the Greek island of Zakynthos in May of 1970. (PX 153) He also performed services in connection with the Filtro company, a dealer of KDI Chloro-Guard units in Geneva, Switzerland. (PX 26A) The extent of these services, which were performed during the time that Gwynn devoted much attention to his medical research, convinces us that the consulting position was not full-time and could be performed in addition to his work for TWA. We therefore hold that Gwynn's earnings at TWA should not be applied in mitigation of the damages for KDI's breach of the consulting agreement.

Under the consulting agreement, Gwynn was to be paid a minimum of $20,000 annually, payable in monthly installments of $1,666.67. He received the last payment from KDI for the month of September, 1970. Therefore, 49 months remained in the five year term of employment. Gwynn is entitled to damages under the consulting agreement in the amount of $81,666.67.

At this point we add that Gwynn is entitled also to recover the following amounts as set forth in Claim No. 178:

a) $6,858.92 as the balance due Gwynn as an "account receivable-officer"; and

b) $11,185.45 as consultant expenses.

### The KDI Counterclaim

 In its amended counterclaim, KDI alleges violations by claimant Gwynn of the securities laws of the United States and the State of California, and also includes a count for fraud and deceit on the part of Gwynn in connection with the events culminating in the Reorganization Agreement.

At the trial, the evidence put on by KDI in support of its amended counterclaim consisted of the testimony of Tim Themy, who testified at some length in support of the KDI allegations. KDI also called to testify as a corroborating witness Stanley Antelman. KDI also offered several depositions by individuals purporting to support the testimony of Themy. We find for claimant on the issues raised by KDI. The amended counterclaim will be dismissed.

We will not dwell at any great length upon our grounds for so holding. Themy's testimony dealt with matters such as his assertion that Gwynn was not in fact a co-inventor of the patents assigned to KDI–CG, but that Themy was the sole inventor; that there were misrepresentations as to the performance of CG units in the field and in the conduct of an inspection of an actual installation; that there was falsification in regard to sales figures, accounts receivable and inventory. All of these matters depended entirely upon oral testimony, chiefly that of Themy. At the hearing we reached an abiding conviction that it was not possible to conclude that Themy was telling the truth. He was clearly in the grip of strong emotion. The great hostility to Gwynn which he freely stated was sufficient to motivate a false or highly colored version of the facts.

Nor did the testimony of Antelman who spoke of events relating to an on site inspection of his home pool where a CG unit was in place, enhance the possibility of truth in the Themy testimony. We base this both upon our observation at the trial together with the fact that this witness was paid a fee for this testimony. In addition, reliance is an essential element of any fraud cause of action. In this case the fact is that KDI acquired a CG unit and sent it to the University of Colorado for testing, thereafter proceeding with the acquisition. This fact makes debtor's case of reliance on purported misrepresentations by the principals of CG questionable. In addition, a post closing audit was conducted. This led to no significant action by KDI so far as this record discloses. Again, this fact works against a conclusion of reliance by KDI.

### Manner of Payment

 In KDI's plan of arrangement, Article II divides unsecured debts into six classes. Class 3 consists of debts in excess of $1,000 and up to and including $10,000. Class 4 consists of debts in excess of $10,000. Article VI consists of debts incurred after the filing of the petition and prior to the order of confirmation. The plan provides for payment to Article II, Class 3 creditors as follows: at the creditor's option, either (a) by payment in cash of 50% of the debt up to a maximum of $5,000, or (b) by payment of the debt in full in the form of $100 (face value) convertible 4% subordinated debentures. Article II, Class 4 creditors are to be paid under the plan in debentures as described in "(b)" above. Article VI creditors are to be paid in full in cash before or within 30 days following the order of confirmation.

Gwynn admits (see Gwynn Memorandum, p. 39) that the following should be treated as Article II, class 3 or 4 claims: (1) account payable in the amount of $6,859.92 (presumably a Class 3 claim because it is less than $10,000); (2) expenses in the amount of $11,185.45 (presumably a Class 4 claim as it exceeds $10,000); and, (3) consulting salary in the amount of $5,000 through December 30, 1970 (class 3 claim).

As to the remaining claims for damages, for breach of the Reorganization and consulting agreements, Gwynn asserts that those components that "accrued" after De-

cember 30, 1970 (the date of the filing of the petition) are debts incurred during the pendency of the arrangement and therefore are Article VI claims which must be paid in full in cash. In support of his argument, Gwynn relies on Judge Porter's opinion of October 11, 1977 and order of June 13, 1980 in *McIntyre v. KDI Corp.*, No. 7801 (proffered as PX 10), wherein Judge Porter stated that, "Class 4 of the Plan of Arrangement provided for trade creditors' unsecured debts." Order, at p. 2, *citing In re KDI Corp.*, 477 F.2d 726, 736 (6th Cir. 1973) ("all of the debts in the first four classes under the plan are trade or commercial debts"). Gwynn states that, "Unliquidated claims by claimants selling their company to KDI Corporation are not provided for in Article II."

KDI argues that all of the damages claimed by Gwynn are "trade or commercial" debts. KDI asserts that because the *McIntyre* decision dealt with a rescission suit, Judge Porter's statement that, "nowhere in this record is there any statement that the then unliquidated claims of recission suit plaintiffs are provided for in the Plan", is inapplicable to the present issue because Gwynn's damages are based on breach of contract. KDI's position is that all of the debts accrued prior to the filing on December 30, 1970 because KDI terminated Gwynn on November 12, 1970 and discontinued the operation of KDI–CG in September of 1970. Therefore, KDI contends that the damages are pre-filing commercial damages which are provided for in Article II of the plan. We conclude that on this issue KDI is correct.

 Gwynn argues that his claims for salary, royalties and damages that "accrued" after the date of filing fall within the language of Article VI. Article VI, however, by its language includes only debts "*incurred* after the filing of the petition and prior to the order of confirmation . . . ." (emphasis added). This article appears to be directed at administrative claims. The term "incurred" may only reasonably be construed as referring to the time at which the debts arose. In the present instance, Gwynn's claims were incurred when he was wronged by KDI, *i.e.*, when KDI wrongfully terminated the Reorganization and consulting agreements. The dichotomy proposed by Gwynn between pre-petition and post-petition claims is based on the premise that his claims accrued over a period of time—the salary claim is argued to have accrued over the five year term of the consulting agreement, and the royalty claim is based on the period from the closing of the reorganization agreement on October 31, 1969 until May of 1978 when Gwynn received from KDI a license of the surviving United States and Canadian patents. If, however, "incurred" is construed as it must be as meaning when the claims or liabilities arose, Gwynn's argument must fail. The period over which Gwynn argues that the claims accrued must correctly be viewed merely as the time period for the calculation of damages based on pre-petition breaches.

 It is further submitted that the *McIntyre* case does not support Gwynn. Gwynn relies on *McIntyre* for the proposition that, "Unliquidated claims by claimants selling their company to KDI Corporation are not provided for in Article II."

The causes of action involved in *McIntyre* were based on securities act violations dealing with fraud in connection with proxy solicitation and sale of securities. Plaintiffs, who sold stock in the Verkamp Corporation to KDI in a merger transaction, sought rescission or damages, and were eventually awarded nearly $1.2 million in damages. In deciding whether such claims were dischargeable by KDI, Judge Porter held that they were not dischargeable because the claims were not provided for in the plan. *McIntyre, supra*, at p. 51. Elaborating further on this point, Judge Porter stated that the first four classes of Article II provided for trade creditors' unsecured debts. Order, at p. 2.

In order to determine whether Judge Porter's holding in *McIntyre* applies to Gwynn's claims, it is appropriate to compare the underlying causes of action to determine whether Gwynn's claims may be

construed as "trade" or "commercial" debts. In *McIntyre*, the securities violations were based on fraudulent activity which was separate and distinct from KDI's operation of its business *qua* business. Even though the claims arose in connection with the sale of the Verkamp Corporation to KDI, they were not the necessary result of actions taken by KDI in the course of regular business operations. On the other hand, Gwynn's claims, although unliquidated, are based on a breach of contract by KDI. While his claims arose from the sale of Chloro-Guard to KDI, the underlying cause of action is based on alleged breaches committed by KDI in the course of the operation of its business and pursuant to business decisions. In this sense, therefore, the claims may be construed as trade or commercial debts within the scope of Article II, Class 3 or 4.

\* \* \*

The foregoing constitutes our findings of fact and conclusions of law.